**2021 IL 125945**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____


(Docket No. 125945)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
CROSETTI BRAND, Appellant.


*Opinion filed November 18, 2021.*


JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, Michael J. Burke, and Overstreet concurred in the judgment and opinion.


**OPINION**

¶ 1     Following a Cook County bench trial, defendant was found guilty of aggravated domestic battery, home invasion, and possession of a stolen or converted motor vehicle. Defendant was sentenced to concurrent prison terms of 16 years for home invasion and 3 years for possession of a stolen or converted motor vehicle. The appellate court affirmed defendant's conviction and remanded the cause for a

preliminary hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984). 2020 IL App (1st) 171728.

¶ 2 On appeal before this court, defendant raises two issues: (1) whether the trial court erred by admitting evidence regarding the contents of messages allegedly sent by defendant to the victim via Facebook Messenger and (2) whether the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle.

¶ 3 We affirm the appellate court's judgment.

¶ 4 I. BACKGROUND

¶ 5 Defendant, Crosetti Brand, was charged with two counts of home invasion (720 ILCS 5/19-6(a)(3) (West 2014)), one count of aggravated domestic battery (*id.* § 12-3.3(a-5)), and one count of possession of a stolen or converted motor vehicle (625 ILCS 5/4-103(a)(1) (West 2014)). The charges stemmed from an incident that occurred on November 3, 2015, when defendant allegedly forced his way into the apartment of his former girlfriend, Anita Shannon, attacked Shannon and threatened her 15-year-old son, M.B., and fled in Shannon's Kia Sedona.

¶ 6 The case proceeded to a bench trial on January 31, 2017. At trial, Shannon testified that defendant was her ex-boyfriend and that they dated for about two years, until she ended the relationship on October 30, 2015. On November 3, 2015, four days after she ended the relationship, defendant went to her place of employment to speak with her. Shannon told defendant that she did not want to talk to him anymore.

¶ 7 Later that evening, at about 7:15 p.m., Shannon was in her apartment preparing dinner for her four children when defendant knocked on the door. She opened the door about six inches and told defendant that she no longer wanted to be with him. Defendant told her that she needed "to come [*sic*] with a better answer than that." Shannon closed the door.

¶ 8 Defendant knocked on the door again. Shannon reopened the door just enough to "peek out" and told defendant that, if he did not leave her alone, she would call the police. Defendant then pushed the door open, entered the apartment, locked the

door behind him, and put a gun to Shannon's chin. Defendant grabbed Shannon by the shirt collar, pushed her up against the wall next to the bathroom door, and began choking her.

¶ 9 Shannon's 15-year-old son, M.B., stepped forward and asked defendant what he was doing. Defendant told M.B. to "get back" and pointed the gun at him. Defendant eventually dragged Shannon into M.B.'s room, banged her head against a dresser, threw her to the ground, and then ran into Shannon's bedroom. After defendant ran into Shannon's bedroom, she heard keys jiggling. Defendant exited the bedroom and fled the apartment. Shannon got up and locked the door behind him. She looked out the window and saw that her car, a 2014 Kia Sedona, was gone. She then called 911.

¶ 10 On November 8, 2015, Shannon received a message from a person named "Masetti Meech" on Facebook Messenger. Shannon explained that "Masetti Meech" was a name that defendant used when he communicated with her on Facebook Messenger while they were dating. Accordingly, Shannon believed that when communicating via Facebook Messenger with Masetti Meech on November 8, 2015, she was actually communicating with defendant.

¶ 11 In the November 8 message, Masetti Meech told Shannon the location on 64th Street where she could recover her 2014 Kia Sedona. Shannon subsequently went to that location and retrieved her vehicle using a spare key. The State did not introduce a copy of the November 8 Facebook Messenger message into evidence because Shannon had deleted it once her "mailbox [got] full."

¶ 12 On November 21, 2015, Shannon received another message from Masetti Meech via Facebook Messenger, a photograph of which was admitted into evidence. Shannon read the contents of the message into evidence:

> "This is just the beginning. Only if you know what's lined up for your people as well. 79, 37, 71st, 39, 42, workplace, 79 is today. I'm coming in from back way. See your brother and OG. Bullets don't have name on them. I will see you soon. I love the waiting game. I parked up and watch and wait. Your son not going to see 16. I see him at school."

Shannon testified that the numbers listed in the November 21 message referred to addresses where she and her relatives either lived or worked.

¶ 13    Defense counsel objected to Shannon's testimony about both Facebook Messenger messages, arguing that they were irrelevant and lacked foundation. The court overruled the objections, stating that "[Shannon] knows the defendant by the nickname of Masetti Meech, whatever it is, a nickname or otherwise. She got a text from him on that day on Facebook or whatever, and that's what he supposedly sent her." A photograph of the November 21 message was admitted into evidence, again over the objection of defense counsel.

¶ 14    Shannon further testified that, on November 24, 2015, she and her brother saw defendant walking on 39th Street near her brother's building. Shannon called 911, and her brother flagged down a police officer.

¶ 15    Later, on November 24, 2015, Shannon went to the police station and spoke with a detective, who showed her a bag containing the car keys that defendant took from her bedroom. The keys were found when the police searched defendant while taking him into custody. A photograph of the bag's contents was admitted into evidence over defense counsel's objection.

¶ 16    M.B. testified that he lives with his mother, Shannon, and his three brothers and sisters. At about 7:15 p.m. on November 3, 2015, M.B. was in his bedroom when he heard a door slam and then saw defendant choking his mother in the hallway outside of his room. M.B. walked toward defendant, who then pointed a gun at M.B. and said, "Is this what you want?"

¶ 17    According to M.B., defendant put the gun underneath his mother's chin and dragged her into M.B.'s bedroom. Defendant shoved his mother to the floor and went into her bedroom and retrieved her car keys. Defendant then left the apartment. M.B. called 911 and handed the phone to his mother to speak to the operator. M.B. looked out the window and saw that his mother's car was gone.

¶ 18    On cross-examination, M.B. testified that he was at home when the police arrived in response to the 911 call but that he did not speak with the officers that evening. M.B. spoke with the officers a week later, on November 10, and told them what he saw.

¶ 19    Officer Steve Austin testified that he arrested defendant at about 3:30 p.m. on November 24, 2015. A custodial search was performed on defendant, and personal property was taken from him and placed in a personal property bag. Officer Austin identified three photographs of a personal property bag as depicting the bag that contained the items recovered from defendant during his custodial search. Officer Austin did not state what the items were.

¶ 20    On cross-examination, Officer Austin admitted that he did not perform the custodial search of defendant and he did not remember whether he was present during the search. On redirect examination, Officer Austin stated that a custodial search is performed during "all arrests." On recross-examination, Officer Austin stated that he did not know who performed the custodial search.

¶ 21    Defendant did not call any witnesses. The parties stipulated that Officer Donald Smith, who responded to the 911 call on November 3, 2015, would have testified that he created a case incident report based on what Shannon told him that night. Shannon told him that, when defendant entered her apartment, he pulled out a silver object that she believed to be a gun and hit her in the head with it. She witnessed defendant subsequently get into her car and drive away. The report does not mention any statement by Shannon that defendant pushed her head into a drawer or pointed his gun at her son, M.B.

¶ 22    The trial court convicted defendant on all counts. In finding defendant guilty of home invasion, the court ruled that the State did not prove beyond a reasonable doubt that defendant was armed at the time, as required for a conviction under section 19-6(a)(3) of the home invasion statute (720 ILCS 5/19-6(a)(3) (West 2014)). Instead, the court found that the State proved defendant's guilt under section 19-6(a)(2), which only required that defendant intentionally injured the victim within the apartment, regardless of whether a firearm was involved. See *id.* § 19-6(a)(2).

¶ 23    Defendant filed a posttrial motion for a new trial. Prior to the hearing on his motion for a new trial, defendant informed the court that he wanted to file a *pro se* motion alleging that his counsel was ineffective. The court informed defendant that "you can file whatever you'd like to file and I will set it for a *Krankel* [(102 Ill. 2d 181)] hearing," but no *Krankel* hearing was ever held.

¶ 24    The trial court denied defendant's motion for a new trial and sentenced him to 16 years of imprisonment for home invasion (merged with aggravated domestic battery) to be served concurrently with 3 years of imprisonment for possession of a stolen or converted motor vehicle. However, the sentencing order incorrectly stated that defendant was convicted of home invasion under section 19-6(a)(3).

¶ 25    The court also entered an order of protection on behalf of the victim against defendant, set to expire two years after defendant's release from prison. Defendant appealed.

¶ 26    On appeal, defendant contended that (1) the trial court erred by admitting evidence regarding the contents of two messages that he allegedly sent to the victim via Facebook Messenger, (2) the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle, (3) the trial court erred by admitting photographs of the victim's car keys allegedly recovered from defendant and inventoried by the police, when the State failed to present a sufficient chain of custody, (4) the court erred by failing to conduct an inquiry under *Krankel*, 102 Ill. 2d 181, regarding his posttrial allegations of ineffective assistance of counsel, (5) the court erroneously considered improper factors during sentencing, (6) the order of protection should be vacated because it was entered in contravention of the statutory requirements, and (7) the mittimus should be corrected to accurately reflect that he was convicted of home invasion under section 19-6(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/19-6(a)(2) (West 2014)) instead of under section 19-6(a)(3) (*id.* § 19-6(a)(3)).

¶ 27    The appellate court affirmed defendant's convictions and sentence. 2020 IL App (1st) 171728. The appellate court found sufficient foundation for admitting the messages the victim testified to receiving from "Masetti Meech" via Facebook Messenger. The appellate court also found that proof of intent to permanently deprive the victim of her car was not required because defendant was charged with conversion or theft. It was sufficient that the victim testified that defendant broke into her residence, committed assault, stole her car keys, and took her car. She found the car five days later based on a message she received via Facebook Messenger from an account previously used by defendant. A little more than two weeks later, a message from the same account threatened her family members, using address information only defendant would have known. Police also found

defendant in possession of the victim's car keys when he was arrested near her brother's workplace. Because the trial court failed to hold a *Krankel* hearing on defendant's ineffective assistance of trial counsel claim, the State agreed a hearing was necessary, and the appellate court remanded the cause for a preliminary *Krankel* hearing. The appellate court also corrected the mittimus on agreement of the parties. 2020 IL App (1st) 171728. This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 28                                   II. ANALYSIS

¶ 29        Defendant raises two issues on appeal before this court: (1) whether the trial court erred by admitting evidence regarding the contents of two messages that he allegedly sent to the victim via Facebook Messenger and (2) whether the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle. We examine each issue in turn.

¶ 30                     A. Admissibility of Facebook Messages

¶ 31        Initially, the State argues that defendant forfeited any authentication argument concerning the Facebook Messenger messages by not objecting at trial or including the argument in a posttrial motion. Defendant contends that his general objection to the admission of the messages was sufficient to avoid forfeiture. We begin by addressing the State's argument that defendant forfeited any argument concerning the State's authentication of the messages.

¶ 32        A "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); see also Ill. R. Evid. 103(a)(1) (eff. Oct. 15, 2015) (an objection must "stat[e] the specific ground of the objection"). When a defendant fails to satisfy either requirement, he forfeits his challenge on appeal. *Woods*, 214 Ill. 2d at 470.

> "This rule is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the

opportunity to correct any deficiency in the foundational proof at the trial level." *Id.*

¶ 33 The appellate court reviewed the State's forfeiture argument, finding as follows:

"Review of the record indicates that there was no forfeiture here. When the State began questioning Ms. Shannon about the November 8 Facebook Message from Masetti Meech, defendant immediately voiced a general objection, which the trial court overruled. When the State subsequently began questioning Ms. Shannon about the November 21 Facebook message from Masetti Meech, defendant immediately stated that he was 'going to object to relevance' and 'foundation as well.' The trial court overruled the objection, stating, 'She got a message from Masetti Meech. She knows him by the name on her Facebook account.' Defendant subsequently argued in his posttrial motion that the court erred in admitting evidence of the November 8 and November 21 Facebook messages over his objections. The trial court denied the posttrial motion." 2020 IL App (1st) 171728, ¶ 26.

¶ 34 After reviewing the record, the appellate court concluded that the trial court was made aware of defendant's claim that the Facebook messages were not properly authenticated because there was insufficient evidence that they actually came from him but that the trial court rejected that claim on the basis of Shannon's testimony that defendant previously used the name "Masetti Meech" when messaging her on Facebook Messenger. Accordingly, the appellate court held that "[w]here, as here, the trial court clearly had the opportunity to review the same essential claim that is later raised on appeal, there is no forfeiture. *People v. Heider*, 231 Ill. 2d 1, 18 (2008)." *Id.* ¶ 27. We agree with the appellate court that defendant did not forfeit his argument concerning the State's authentication of the messages.

¶ 35 We now address defendant's argument that the November 8 and November 21 messages were not properly authenticated. Defendant argues that the lower courts ignored the unique authentication problems social media posts present due to the potential for hacking an account, gaining unauthorized access in other ways, or creating new fraudulent accounts. Defendant suggests these issues demand a higher standard for laying a foundation for digital messages requiring proof that defendant (1) actually controlled the account used and (2) actually sent the message. The State

counters that messages sent via Facebook Messenger are subject to the same authentication requirements as any other documentary evidence.

¶ 36 The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *People v. Taylor*, 2011 IL 110067, ¶ 27. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The Illinois Rules of Evidence govern the admissibility of evidence in proceedings in the courts of Illinois, with limited exceptions not applicable here. See Ill. R. Evid. 101 (eff. Jan. 6, 2015); see also Ill. R. Evid. 402 (eff. Jan. 1, 2011) (relevant evidence is generally admissible). The Illinois Rules of Evidence provide that authentication as a "condition precedent" to the admissibility of evidence is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Jan. 1, 2011).

¶ 37 Illinois Rule of Evidence 901(b) provides "examples of authentication or identification conforming with the requirements of [Rule 901]." Ill. R. Evid. 901(b) (eff. Jan. 1, 2011). At the time of defendant's bench trial in January 2017, example (4) of Rule 901(b) stated:

"Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics taken in conjunction with circumstances." Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011).

¶ 38 This court amended example (4) of Rule 904(b), effective September 17, 2019, adding "including those that apply to the source of an electronic communication" after the phrase "or other distinctive characteristics." Gino L. DiVito opined in his author's commentary on the 2019 amendment to Rule 901(b) and its subdivisions:

"Until that revision, no evidence rule had specifically addressed authentication of electronic communications such as text messages, emails, and social media sites. Before the amendment, Rule 901(b)(4), which provides circumstantial evidence of authenticity based on 'distinctive characteristics,' was nevertheless the go-to rule for a trial court's determination of an electronic communication's authenticity. But the supreme court's amendment now makes it clear that such communications are subject to the rule. The court recognizes the impact of

rapidly evolving technology on the admissibility of evidence and the need for the rules to keep pace. The amendment makes explicit what previously was implicit." Gino L. DiVito, *The Illinois Rules of Evidence: A Color-Coded Guide* 292 (2021), https://www.tdrlawfirm.com/assets/downloads/Illinois_Rules_of_ Evidence_Color-Coded_Guide.pdf [https://perma.cc/QLS3-XEX8].

¶ 39    Other evidentiary treatises have also acknowledged that e-mail messages, text messages, information from social media, and websites "may be authenticated through various traditional common law methods such as the reply doctrine, distinctive characteristics, chain of custody," or another process or system that ensures "the accuracy of the message and the identity of the sender." Michael H. Graham, Handbook of Illinois Evidence § 901.9, Commentary, at 1220 (2021 ed.); see also, Graham, *supra*, § 901.4, Commentary (collecting cases); John H. Wigmore, Evidence § 2130, at 1338 (Supp. IV 2021) ("[A]uthentication of electronic communications such as emails, text messages, and social media posts and messages. For each of these categories, courts have required some evidence of genuineness to provide a foundation for authentication, emphasizing that electronic communications are no more self-authenticating than other comparable documents.").

¶ 40    Although the 2019 amendment to example (4) of Rule 901(b) was not available at the time of defendant's 2017 bench trial, the amendment merely clarified what was already implicit—that electronic communications are subject to the rule. Before the adoption of Rule 901 in 2011, Illinois case law had long recognized these same principles of authentication by use of circumstantial evidence, including factors such as appearance, contents, and substance. See *People v. Towns*, 157 Ill. 2d 90, 104 (1993). As we have explained, reliability may be established when a witness testifies as to the distinctive characteristics of the electronic communication as a foundational basis for proving the source of the electronic communication. See, *e.g.*, *People v. Caffey*, 205 Ill. 2d 52, 95 (2001) ("Reliability may be established when the witness testifies that when he or she received telephone calls, the witness checked the caller ID and that the same number always appeared for the same caller."). Subsequent to the adoption of Rule 901, our appellate court has recognized authentication factors that support the admissibility of electronic and social media communications. See, *e.g.*, *People v. Diomedes*, 2014 IL App (2d) 121080, ¶¶ 17-19 (citing Rule 901(b)(4) in holding that authentication requirements

for the admissibility of an e-mail message may be satisfied when the contents of the document, in conjunction with other circumstances, reflect distinctive characteristics and that there is no obligation to prove that the IP address from which the e-mail was sent was connected to the defendant); and *People v. Walker*, 2016 IL App (2d) 140566 (applying Rule 901(b)(4) to establish circumstantial evidence that the defendant arranged or was accountable for a fourth drug sale where text messages involving a phone number used by an undercover officer to receive and make calls to the defendant and buy drugs from him on three prior occasions before using only text messages for the fourth drug purchase).

¶ 41 Here, the parties agree that evidence of a message sent via Facebook Messenger is admissible as documentary evidence. Indeed, they acknowledge that our appellate court has treated social media messages as documentary evidence for admissibility purposes, despite the digital nature. See, *e.g.*, *People v. Curry*, 2020 IL App (2d) 180148, ¶¶ 55-56; *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86. The parties simply disagree whether, under the facts of this case, the trial court abused its discretion in admitting the evidence.

¶ 42 Here, the appellate court found *Kent* informative. In *Kent*, the defendant was charged with first degree murder of the victim, who was shot in the driveway of his residence. *Kent*, 2017 IL App (2d) 140917, ¶¶ 3-4. At trial, a detective testified that, the day after the murder, he searched Facebook and found a profile under the name " 'Lorenzo Luckii Santos' " that contained a photograph of a person resembling the defendant. *Id.* ¶ 57. The Santos Facebook profile contained a post reading " 'its my way or the highway.....leave em dead n his driveway.' " *Id.* The detective testified that the profile name " 'Lorenzo Luckii Santos' " was " 'associated' " with this post, and he printed a screenshot of it. *Id.* The detective provided no testimony concerning when the post was created, but he testified that the post was deleted later that same day. *Id.*

¶ 43 The defendant in *Kent* objected to the Facebook evidence, arguing that the State failed to provide sufficient authentication. *Id.* ¶ 58. The trial court overruled the objection, finding that the Facebook post was sufficiently authenticated with the profile name, the photograph of the person resembling defendant, and the statement about leaving someone " 'dead n his driveway.' " *Id.* ¶¶ 57-58.

¶ 44	The defendant appealed, arguing that the trial court abused its discretion in admitting the Facebook post, as it was not properly authenticated. *Id.* ¶ 66. The appellate court in *Kent* noted that " ' "[t]he authentication of social media poses unique issues regarding what is required to make a *prima facie* showing that the matter is what the proponent claims." ' " *Id.* ¶ 105 (quoting *Smith v. State*, 2012-CT-00218-SCT (¶ 19) (Miss. 2014), quoting Nathan Petrashek, *The Fourth Amendment and the Brave New World of Online Social Networking*, 93 Marq. L. Rev. 1495, 1506 (2010)). The appellate court in *Kent* reasoned that

> "concern over authentication arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and consequently, the potential for fabricating or tampering with electronically stored information on a social networking website is high and poses challenges to authenticating printouts from the website." *Id.* ¶ 106.

Citing *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012)), a Texas case that surveyed cases addressing the authentication of various forms of electronically stored information, the appellate court in *Kent* held that the following factors were relevant for determining whether a social media post was properly authenticated:

> "(1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or (6) other circumstances peculiar to the particular case may suffice to establish a *prima facie* showing of authenticity." *Kent*, 2017 IL App (2d) 140917, ¶ 118.

¶ 45	The appellate court in *Kent* noted that these examples "are intended only as a guide" and that " '[e]vidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the "type and quantum" of

evidence necessary to authenticate a web page will always depend on context.' " *Id.* ¶ 119 (quoting *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014)).

¶ 46    In *Kent*, the appellate court noted that the State offered neither direct nor circumstantial proof of authentication. *Id.* ¶ 103. The defendant did not admit making the post or creating the Facebook profile, and nobody saw him composing the post. *Id.* At the pretrial hearing, the State represented that the computer from which the Facebook post originated would have an Internet protocol (IP) address belonging to defendant's girlfriend, but no such evidence was presented at trial. *Id.* The State offered no evidence that any of the information in the Facebook post "was known or available only to defendant or, at the very least, to a small group of people including defendant." *Id.* ¶ 116. Also, "the State offered no evidence that defendant ever accessed Facebook or even used the Internet. At best, the photograph and the name on the Facebook profile are *about* defendant and not evidence that defendant himself had created the post or was responsible for its contents." (Emphasis in original.) *Id.* ¶ 111. Accordingly, the appellate court in *Kent* held that, without some basis from which a reasonable juror could conclude that the Facebook post was "not just any Internet post but was, in fact, created by defendant or at his direction," the trial court abused its discretion by admitting the Facebook post and the detective's testimony. *Id.* ¶ 119.

¶ 47    More recently, in *Curry*, 2020 IL App (2d) 180148, the appellate court considered whether the trial court abused its discretion in admitting Facebook records as self-authenticating business records. The defendant in *Curry* was charged with criminal sexual assault. *Id.* ¶ 1. Before trial, the State moved *in limine* to admit, as self-authenticating business records, messages sent through Facebook from defendant to the victim. *Id.* ¶ 7. The trial court found that the Facebook messages were admissible to show only " 'where [the messages] came from and where they went to.' " *Id.* The message content would require victim authentication " 'pertaining to [the conversations].' " *Id.*

¶ 48    At trial, the victim in *Curry* testified that the defendant was a friend of her mother and cousin and that she awoke with defendant on top of her and his penis was inside her vagina. She got up and ran to the bathroom and told defendant he was not supposed to be in her bedroom. *Id.* ¶ 8. The victim ran to her mother's

room, woke her up, and told her about the incident, and the police were called. *Id.* ¶ 9.

¶ 49    The victim in *Curry* further testified that she had a Facebook account for about four years and was a " 'Facebook friend' " with defendant for about two years. *Id.* ¶ 10. Before the sexual assault, the victim and the defendant had used their phone Facebook Messenger application to communicate. She was familiar with defendant's Facebook messages because they included his name and his photo. Defendant also called the victim by her nickname, and they discussed mutually familiar topics. *Id.* According to the victim, she received several Facebook messages from the defendant before the incident, and she did not respond because she was asleep. After the incident, while police were transporting the victim for a sexual-assault examination, defendant sent another message telling her not to sign a complaint, adding that she would never see him again and that he would never bother her again if she would say that her report was false. The victim sent the defendant several messages asking why he was in her bed and had pulled down her pants. *Id.* ¶ 11.

¶ 50    At the hospital, the victim told a police officer that defendant was sending her messages. The officer said he would call another officer and have him take defendant's phone. After that, the victim did not receive any messages from defendant. *Id.* ¶ 12.

¶ 51    The trial court in *Curry* admitted the Facebook documents obtained by police, including the messages between the defendant and the victim, finding that the victim's testimony provided the additional foundation for admission of their content. *Id.* ¶ 23. Defendant was found guilty and appealed, arguing, *inter alia*, that the trial court abused its discretion in admitting the content of the Facebook messages because there was insufficient authentication. *Id.* ¶ 33.

¶ 52    The appellate court in *Curry* affirmed defendant's conviction. *Id.* ¶ 61. The appellate court examined *Kent*, 2017 IL App (2d) 140917, and rejected the defendant's reliance on *Kent*, finding it factually distinguishable "given the substantial and circumstantial evidence connecting the instant messages to defendant." *Curry*, 2020 IL App (2d) 180148, ¶ 55. Specifically, the appellate court recognized: "Facebook messages are akin to e-mails or text messages. An e-mail may be authenticated through circumstantial evidence. [Citation.] A text message

- 14 -

similarly may be authenticated through circumstantial evidence. [Citations.]" *Id.* The appellate court determined that, based on the circumstantial evidence suggesting that defendant authored the Facebook messages, they were properly authenticated and that the trial court did not abuse its discretion in admitting the content of the messages. *Id.* ¶¶ 57-59

¶ 53    We determine that the present case is more akin to *Curry*. Here, the State presented sufficient circumstantial evidence properly authenticating the November 8 and November 21 Facebook Messenger messages from "Masetti Meech." The victim, Ms. Shannon, testified that while they were dating, defendant messaged her via Facebook messenger multiple times under the username "Masetti Meech." Based on defendant's repeated use of the username "Masetti Meech" when messaging her, Shannon believed that the November 8 and November 21 messages from "Masetti Meech" actually came from defendant. The State here also provided evidence that the November 8 Facebook message contained unique information that was not widely known to persons other than defendant and the victim. Specifically, the November 8 Facebook message from "Masetti Meech" informed Shannon about the location of her car, which she subsequently retrieved from the location identified in the message. Shannon testified that defendant was the person who had taken her car five days earlier. Thus, defendant was in the unique position of knowing where he had disposed of the vehicle. We find that the trial court could reasonably conclude that defendant was the author of the November 8 Facebook Messenger message from "Masetti Meech" to Ms. Shannon, which accurately informed her of the location of her vehicle.

¶ 54    The State also provided evidence that the November 21 Facebook Messenger message contained unique information known to a small group of people, including defendant. Specifically, the November 21 message from "Masetti Meech" to Ms. Shannon contained threats to shoot "your people," including her son, who was "not going to see 16," and stated "79, 37, 71st, 39, 42, workplace, 79 is today." Shannon testified that "79" represented 79th Street where her mother lives, "37" represents 37th Street where her sister lives, "71" represents 71st Street where her other sister lives, "39" represents 39th Street where her brother lives, and "42" represents "the main office to the workplace where [she] used to work." The author of the November 21 message knew the age of Ms. Shannon's son, as well as the address of her place of work, and the residential addresses of her mother, brother, and two

- 15 -

sisters. The totality of this information would have been known only to people close to Ms. Shannon, including defendant, who was her ex-boyfriend of two years. We find that the trial court could reasonably conclude that defendant authored the November 21 Facebook Messenger message from "Masetti Meech."

¶ 55        Under these circumstances, we cannot say that the trial court abused its discretion in finding that the November 8 and November 21 Facebook Messenger messages from "Masetti Meech" to Ms. Shannon were authenticated as coming from defendant.

¶ 56                    B. Possession of a Stolen or Converted Motor Vehicle

¶ 57        Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle in connection with his alleged unlawful possession of Ms. Shannon's 2014 Kia Sedona. According to defendant, the State failed to prove that he took the car with the intent to permanently deprive Ms. Shannon of its use. The State asserts that defendant's arguments ignore that the State was only required to prove that defendant knew that Shannon's car was converted when it was in his possession.

¶ 58        When reviewing the sufficiency of the evidence, the relevant question is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009). Section 4-103(a)(1) of the Illinois Vehicle Code states that it is a felony for a person not entitled to the possession of a vehicle to possess it, knowing it to have been "stolen or converted." 625 ILCS 5/4-103(a)(1) (West 2014).

¶ 59        Here, defendant's indictment alleged that "he, not being entitled to the possession of a motor vehicle, to wit: a 2014 Kia Sedona, property of Anita Shannon, possessed said vehicle knowing it to have been stolen or converted." Therefore, to sustain a conviction for the offense as charged, the State was required to prove beyond a reasonable doubt that defendant (1) possessed Ms. Shannon's 2014 Kia Sedona, (2) was not entitled to possess the vehicle, and (3) knew that the vehicle was either stolen or that it was converted.

¶ 60 Defendant tries to refocus the analysis to look at the difference between stealing a motor vehicle and converting a motor vehicle. In support, defendant places significant reliance on *People v. Cramer*, 85 Ill. 2d 92 (1981). Yet, *Cramer* is distinguishable and does not govern resolution of this case. At issue in *Cramer* was whether the defendant, who was charged with theft, was entitled to an included-offense jury instruction based upon section 4-103(a). *Id.* at 94-95, 100. That issue is not presented here. Also, to the extent that *Cramer* has been interpreted as indicating that the State's burden of proof under section 4-103(a) is higher if the defendant participated in the actual taking of the vehicle, we disagree. Nothing in the plain language of section 4-103(a) suggests that the State bears a heightened burden of proof where, as here, the evidence shows that the defendant was responsible for the initial taking of the vehicle.

¶ 61 Here, defendant was charged only with possession of a stolen or converted motor vehicle. Thus, the State was only required to prove that defendant knew the car was either stolen or converted. See *In re Karavidas*, 2013 IL 115767; *People v. Gengler*, 251 Ill. App. 3d 213 (1993).

¶ 62 The evidence here proved that defendant knew he either stole the vehicle (took with the intent to permanently deprive the owner) or converted it (took control of temporarily). Ms. Shannon and her son heard defendant going through her purse in Shannon's room before he left the apartment. When they looked outside, Shannon's Kia Sedona was gone, as were the car keys from her purse. Since the defendant and Shannon dated for about two years, he undoubtedly knew her car and where to find her car keys. Several days later, Ms. Shannon received a Facebook message from "Masetti Meech," an account defendant used to message Shannon in the past, telling her where to find her car. Shannon found her car where the message told her it would be located. When defendant was arrested, he had the victim's car keys in his possession. This evidence was sufficient for a reasonable fact finder to conclude that defendant took Ms. Shannon's car without her permission, either with the intent to take it permanently or temporarily from her control.

¶ 63 Thus, the State proved defendant knowingly and wrongfully deprived the victim of her vehicle for several days. This was sufficient to sustain his conviction as charged under section 4-103(a)(1). We therefore affirm defendant's conviction.

¶ 64                             III. CONCLUSION

¶ 65        For the foregoing reasons, we affirm the judgment of the appellate court, which
affirmed defendant's conviction and remanded for a *Krankel* hearing.

¶ 66        Affirmed and remanded.