2024 IL App (1st) 230819-U

No. 1-23-0819

Order filed May 24, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 16397 |
| | ) | |
| LESTER JOHNSON, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err when it admitted a detective's testimony describing actions depicted on surveillance videos of which the detective had no firsthand knowledge where the testimony was rationally based on the detective's perception of the videos and helpful to the jury in determining the facts in the case.

¶ 2    Following a jury trial, defendant Lester Johnson was convicted of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) and residential burglary (720 ILCS 5/19-3(a) (West 2018)) and sentenced to concurrent prison terms of 45 years and 15 years, respectively. On appeal, Johnson

contends the trial court erred when it allowed a detective to narrate her interpretation or opinion of what was depicted on surveillance videos recovered from three neighbors' homes because the detective did not have personal knowledge of the events depicted, the videos spoke for themselves, and doing so invaded the province of the jury. For the following reasons, we affirm.

¶ 3                                           I. BACKGROUND

¶ 4       At trial, the State presented three stipulations that surveillance videos recorded outside homes located at 1328 North Bell Avenue, 1352 North Bell Avenue, and 1342 North Oakley Avenue in Chicago were true and accurate recordings of events that occurred on May 28, 2018.

¶ 5       E.T. testified that on May 27, 2018, she and her roommate, Natasha Mraz, lived in a third-floor apartment of a "house" located at 1322 North Bell Avenue. The gate in front of the house was never locked. The front door of the house was always locked and only the tenants living there could enter through that door. In the back of the house was a stairwell that led up to a deck outside E.T.'s apartment. A door on the deck entered directly into the back of E.T.'s apartment. The lock on the back door was difficult to fully lock. E.T.'s bedroom was at the front of the apartment and had a window that faced Bell Avenue.

¶ 6       About 10:15 p.m., E.T. and a friend ate dinner at a restaurant near E.T.'s apartment. They left the restaurant shortly before midnight and walked together down North Avenue. When they reached Bell Avenue, they parted ways and E.T. walked southbound down Bell Avenue alone. Halfway down the block, E.T. noticed a man walking very quickly about two houses behind her. The man was wearing a white shirt and baseball cap and had his head bent down. E.T. had an uncomfortable feeling. When she reached her building, E.T. unlocked the front door as quickly as

possible and entered. She closed the door but kept it slightly open to ensure the man passed by. When he did, E.T. went upstairs, entered her apartment, and locked the door.

¶ 7    E.T. noted Mraz's bedroom door was closed, which meant Mraz was home. E.T. turned on the dining room light, walked to her bedroom, turned on her bedside lamp, and got ready for bed. About 10 minutes later, E.T. turned off the lights and went to bed, wearing only her underwear.

¶ 8    As E.T. began drifting to sleep, she saw her bedroom door open. A "strange" Caucasian man wearing a white shirt, black baseball cap, and black shorts walked into her bedroom with a knife in his hand. E.T. did not know the man. As the man approached E.T. he said, "[b]e quiet, get on your stomach, I'm not going to hurt you." As E.T. turned onto her stomach, the man stood next to her bed and held the knife against E.T.'s throat. The man sat on top of E.T. on his knees, straddling her hips and waist. The man pressed the knife blade firmly against E.T.'s throat and said, "I don't want to hurt you, I just want your things." E.T. reached for her cell phone and offered it to the man. He did not react.

¶ 9    The man moved the knife away from E.T.'s throat and she heard a rattling noise behind her that sounded like the man "fidgeting" with his belt. E.T. feared the man was going to rape her. E.T. reached back with her right hand and grabbed the blade of the knife. She pushed the man and the knife back as far as she could and began screaming. The man "sliced" the knife out of E.T.'s hand, severing a nerve and the tendons of three of her fingers. As the man got off the bed, he stabbed E.T. in her upper left thigh near her hamstring.

¶ 10    The man fled from E.T.'s bedroom. She immediately rose from the bed and saw the man running towards the rear of her apartment near the kitchen. E.T. threw on a nightgown and saw the man run past Mraz's back bedroom. E.T. noted the man was wearing black sneakers and white

socks. E.T. ran after the man and yelled for Mraz to call 911. The man ran out the back door. E.T. knocked on Mraz's bedroom door and repeatedly yelled at her to call 911. E.T.'s leg was bleeding. She collapsed outside Mraz's bedroom and drifted in and out of consciousness. She recalled Mraz's boyfriend, Harrison Egbon, was also in their apartment.

¶ 11    When the police arrived, E.T. was semi-conscious. She recalled giving the police a description of a man wearing black shorts and a white shirt. Paramedics transported E.T. to a hospital where she was treated for her injuries. The following day E.T. underwent surgery to repair the severed tendons in her fingers. Sometime later she also had surgery on her left leg. E.T. testified that she does not have full range of movement in three of her fingers and never regained full feeling in her pinky. She pointed out scars on her fingers and demonstrated that she cannot completely close her right hand into a fist.

¶ 12    On June 2, 2018, a detective showed E.T. a photo array. E.T. was unable to identify her assailant. Detectives also showed her surveillance videos recovered from several of her neighbors' homes. E.T. testified that when she watched the videos with the detectives, she saw herself and the man who was following her, who was "eventually, in my house." In court, E.T. identified several photographs that depicted her apartment on the date of the incident. One photo showed a black bandana and black zip ties on E.T.'s bed. E.T. testified that those items did not belong to her or Mraz and were not there when E.T. went to bed that night.

¶ 13    When the State played two surveillance videos in court, E.T. pointed out herself walking home on Bell Avenue and the man walking behind her. In a third surveillance video, E.T. identified a man walking in an alley as "the man that I saw behind me as I was walking home, and he was then in my home." E.T. further stated, "[h]e attacked me."

¶ 14    On cross-examination, E.T. acknowledged that when she viewed the photo array, she identified another man as the offender even though Johnson's photo was included in the array. E.T. further acknowledged that she never told the police that the attacker had tattoos. Throughout the entire incident, E.T. was able to see the offender's face for about five seconds.

¶ 15    Natasha Mraz testified that on the night of the incident, she and her boyfriend fell asleep in her bedroom about 11:30 p.m. She heard E.T. come home and fell back asleep. Shortly before 1 a.m., Mraz awoke to E.T. screaming her name. Mraz opened her bedroom door and saw E.T. trying to hold herself up against the wall. Mraz called 911. Her 911 call was played in court. Mraz did not check if the back door was locked before she went to sleep. She did not see the offender.

¶ 16    Chicago police officer Enrique Cervantes testified that about 12:54 a.m. on May 28, 2018, he responded to a call about a stabbing and went to E.T.'s apartment. E.T. was slumped on the floor and bleeding profusely. E.T. described the offender as a white man in his mid-40s, bald, and wearing a white T-shirt and shorts. Cervantes observed zip ties and a "wet or damp" bandana on E.T.'s bed.

¶ 17    Chicago police evidence technician Thomas Worthem testified that he photographed E.T.'s apartment and recovered two black zip ties and a black and white bandana from E.T.'s bed. The photographs, zip ties, and bandana were admitted into evidence.

¶ 18    Chicago police detective Patricia Pedroza testified that she was assigned to investigate the offense at E.T.'s apartment later that morning. Pedroza had been a detective for 20 years and specifically worked as a robbery and burglary detective out of the Area North headquarters, which included the Wicker Park neighborhood where the offense occurred. After speaking with E.T., Pedroza learned the route E.T. had taken when walking home. E.T. had walked about three blocks

southbound on Bell Avenue from North Avenue to her apartment. In court, Pedroza identified a map of the area that included the location of the restaurant, North Avenue, and Bell Avenue.

¶ 19    Pedroza and her partner, Detective Pagan, went to E.T.'s apartment building and canvassed the area looking for witnesses and any surveillance video. Pedroza found three separate residences that had surveillance cameras and recovered videos from those homes. The residence at 1328 North Bell Avenue was about four houses north of E.T.'s apartment. The residence at 1352 North Bell Avenue was also north of E.T.'s apartment, on the corner of the block. The residence at 1343 North Oakley Avenue shared an alley with the residences on Bell and had a camera that recorded activity in the alley. Pedroza identified a map of the 1300 blocks of Bell and Oakley with flags indicating the locations of E.T.'s residence and the three other residences.

¶ 20    The next day, Pedroza viewed the surveillance videos with E.T. Pedroza testified that the videos depicted a woman walking southbound, and E.T. identified herself as that woman. Pedroza further testified that the videos depicted a white man wearing shorts, dark gym shoes, and a white T-shirt walking behind E.T. in the same direction. E.T. had identified that man as the same man she saw following her.

¶ 21    The prosecutor then asked Pedroza to describe what she saw in the surveillance videos. From memory, Pedroza testified in detail how two videos depicted E.T. walking southbound as she passed two different cameras on Bell, and moments later, each of those videos showed the same man walking behind her. Pedroza explained that the next video showed the same man walking northbound past those same two cameras. Pedroza further testified in detail that three cameras located in the alley shared by Bell and Oakley depicted the same man walking southbound through the alley and urinating on a garage.

¶ 22    Defense counsel then objected and argued that under the best evidence rule, the State should play the videos for the jury rather than having Pedroza describe them. The trial court stated that Pedroza had been asked to describe what she saw in the video. Defense counsel acknowledged that was correct. The trial court overruled the objection.

¶ 23    Pedroza continued with her description, testifying that the video depicted the man's tattoos and showed him wiping his face with a black cloth. She explained that the man walked northbound through the alley and moments later returned walking southbound in the alley and heading east at the end of the alley. Pedroza further explained that the videos showed the same man 20 minutes later running past one camera on Bell, trying to jump over a fence in front of another camera on Bell, and ultimately running northbound on Bell and out of sight.

¶ 24    The State then published a series of video clips to the jury, alternating between clips on three separate DVD disks. As each video was played, Pedroza described what was happening. As the first video played, Pedroza testified, "[t]hat's the victim walking southbound past 1352." Pedroza confirmed the time stamp of the video was 12:12 a.m. and that 1352 Bell was the address furthest north from E.T.'s apartment. Pedroza pointed out the white man wearing a white shirt, white socks, and dark shoes walking behind E.T. passing 1353 North Bell at 12:13 a.m.

¶ 25    The State played a video from a different DVD and Pedroza identified E.T. walking southbound past 1328 North Bell at approximately 12:14 a.m. and the same man walking behind her. Pedroza confirmed that 1328 North Bell was located between 1352 North Bell and E.T.'s apartment at 1322 North Bell. In a third video, Pedroza pointed out the same man walking northbound past 1328 North Bell at 12:24 a.m. In the next video, from a different DVD, Pedroza pointed out the same man walking northbound past 1352 North Bell.

¶ 26   When the next video played, Pedroza explained that the camera was located on the rear of the building at 1352 North Bell and was facing southbound. Pedroza explained that the video showed a man wearing shorts, dark shoes, white socks, a light shirt, and a baseball cap walking southbound. Pedroza also noted tattoos on the man's right arm. In the next video from the same camera, Pedroza stated that the same man was in the middle of the alley walking northbound towards 1352 North Bell at 12:31 a.m. In the next video, Pedroza explained that the man removed his hat and commented "you can see that he's balding." She then noted that the man put his hat back on and walked southbound in the alley.

¶ 27   The State switched to the third DVD and stated that the video was recorded from a camera in the alley at 1343 North Oakley. Pedroza explained that the camera was facing northbound. Pedroza then explained:

> "You're looking at Bell on the right side there. So, it's on the east side of the street or east side of the alley. These cameras are located on the west side of the alley. You can see the individual down at the end of the block by the camera at 1352 North Bell. It looks like he's tying his shoe, or he's bent over."

The prosecutor noted that one of the jurors was squinting and asked if the juror would like the screen moved closer. The juror replied, "[y]es." When the video resumed, Pedroza testified that the man was walking southbound towards the cameras at 1343 North Oakley. Pedroza stated that the man was going to stop and urinate on a garage. She pointed out a tattoo on his left leg. Pedroza also noted that the man was wiping his face with a dark cloth. She explained that he continued walking northbound through the alley and went out of view at the end of the alley.

¶ 28    The State showed another video from the alley at 1343 North Oakley at 12:34 a.m. Pedroza explained that camera was facing southbound. Pedroza noted that the man was wiping his face with the cloth and had tattoos on both arms and legs. Two minutes later, the man walked southbound in the alley, removed and replaced his hat, and had the black cloth in his hand. In the next video, the man continued walking southbound with the black cloth in his hand. Pedroza explained that at the end of the alley the man walked east and out of view. Pedroza confirmed that while walking southbound, the man was walking towards 1322 North Bell, which was on the east side of the alley.

¶ 29    Pedroza confirmed that Mraz called 911 about 12:51 a.m., and Pedroza retrieved surveillance video from that time. The State showed a video clip from the first DVD recorded at 12:50 a.m. at 1328 North Bell. Pedroza explained that the same man was running northbound past the camera. The State switched to the second DVD and showed a video recorded at 12:50:53 a.m. at 1352 North Bell. Pedroza testified that the video showed the same man trying to climb over the fence at 1352 North Bell. The man ran southbound, then ran northbound out of view.

¶ 30    In court, Pedroza identified Johnson as the man arrested in connection with her investigation. Pedroza testified that when viewing the videos, E.T. identified the man in the alley as the same man who followed her when she was walking home and the man who attacked her in her bedroom.

¶ 31    Chicago police officer Jose Hernandez testified that on October 25, 2018, he arrested Johnson at a house in Broadview, Illinois.

¶ 32    The State presented a stipulation that on February 21, 2019, an investigator with the State's Attorney's Office collected a buccal swab from Johnson which was submitted to the Illinois State Police crime laboratory for DNA analysis.

¶ 33    Lynette Wilson, a forensic scientist with the Illinois State Police, testified that the bandana recovered in this case contained a mixture of DNA from at least four people with one major DNA profile that was male. The major DNA profile was entered into a database wherein it was associated with Johnson. Wilson then requested a standard from Johnson for confirmatory forensic analysis. Wilson subsequently received the buccal swab collected from Johnson and conducted DNA analysis of that standard. Johnson's DNA profile matched the DNA profile recovered from the bandana with a commonality of no more than 1 in 86 septillion individuals.

¶ 34    The jury found Johnson guilty of home invasion and residential burglary. The trial court subsequently sentenced Johnson to concurrent prison terms of 45 years for home invasion and 15 years for residential burglary.

¶ 35                                      II. ANALYSIS

¶ 36    On appeal, Johnson solely contends that the trial court erred when it allowed Detective Pedroza to narrate her interpretation or opinion of what was depicted on the surveillance videos recovered from three neighbors' homes. Johnson argues that Pedroza's testimony was improper lay opinion testimony regarding events of which she had no personal knowledge. He further claims that the videos were clear and spoke for themselves, and Pedroza's testimony was not needed to assist the jury in understanding what it was viewing. Johnson also argues that Pedroza's testimony went to the ultimate question of whether he was the man in the videos and the man who attacked E.T., thereby invading the province of the jury.

¶ 37    The State responds that Pedroza's testimony was properly admitted under Illinois Rule of Evidence 701 where it was rationally based on her perception of the videos. The State further argues that the testimony was helpful to the jury in determining whether the man in the videos was at specific locations at relevant times and whether he was the same man who attacked E.T. The State asserts that Pedroza provided valuable geographic context and established the sequence of events as the prosecutor switched from clip to clip in what would otherwise have been a disjointed array of videos. Alternatively, the State argues that any error in admitting Pedroza's testimony was harmless because the evidence against Johnson, including his DNA, was overwhelming.

¶ 38    Initially, the parties disagreed on the proper standard of review. Johnson acknowledges that, in general, a trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 30. He argues, however, that the question of whether Pedroza's testimony narrating and interpreting the events depicted on the surveillance videos was admissible is a legal issue that does not require any fact finding or credibility determinations and, thus, should be reviewed *de novo*. *Id.*

¶ 39    The State asserts that the trial court's decision to allow Pedroza's testimony was an evidentiary ruling that rested in the sound discretion of the trial court and, therefore, must be reviewed under the abuse of discretion standard. *People v. Thompson*, 2016 IL 118667, ¶ 53. The State argues that, unlike *Sykes*, in this case there is at least one disputed fact on appeal as the parties disagree whether Pedroza had personal knowledge of the events portrayed in the videos.

¶ 40    We note that *Sykes* predated *Thompson*. In *Thompson*, our supreme court stated that the trial court's decision to admit lay opinion identification testimony under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) is reviewed under an abuse of discretion standard. *Thompson*, 2016 IL

118667, ¶ 49. As Johnson is challenging the trial court's decision to admit Pedroza's testimony, and the parties disagree as to whether Pedroza had personal knowledge of the events in the videos, we apply the abuse of discretion standard here. Consequently, we will not disturb the trial court's ruling unless we find that the court abused its discretion. *People v. Brand*, 2021 IL 125945, ¶ 36. An abuse of discretion occurs when the trial court's ruling is unreasonable, arbitrary, or fanciful, or when no reasonable person would agree with that ruling. *Id.*

¶ 41     A lay witness may only testify to events of which he or she has personal knowledge. Ill. R. Evid. 602 (eff. Jan. 1, 2011). Under Evidence Rule 701, a lay witness's opinion testimony must be (1) rationally based on the witness's perception, (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (3) not based on scientific or specialized knowledge that requires a qualified expert. Ill. R. Evid. 701. A lay witness's opinion testimony is not inadmissible merely because it embraces an ultimate issue that must be decided by the jury. Ill. R. Evid. 704 (eff. Jan. 1, 2011).

¶ 42     Illinois courts have long allowed testimony from lay witnesses who did not personally observe the events depicted in a video recording. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 52. A witness's opinion is rationally based on her perception if that opinion could be normally formed from observing facts. *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 72. Thus, "[a]n opinion as to what a video depicts is an opinion that a layperson could normally form from observing the video." *Id.* Whether a witness's testimony was rationally based on her perception does not depend on whether she had personal knowledge of the actual people, actions, or objects depicted in the video. *Id.* ¶ 73. Instead, the relevant perception is her "perception of *the video*." (Emphasis in original.) *Id.*

¶ 43    Here, the record clearly demonstrates that Pedroza's testimony narrating the surveillance videos was rationally based on her perception from observing those videos. Pedroza testified that, during her investigation, she canvassed the neighborhood and recovered surveillance videos from three different residences. As part of that process, Pedroza necessarily would have had to view the videos to identify the footage relevant to this case. Pedroza testified that she viewed the videos with E.T. the day after the attack. At that time, E.T. identified herself in the videos as well as the man she saw following her as she walked home. The record further shows that, prior to publishing the videos to the jury, the prosecutor asked Pedroza to describe what she saw in the videos. From memory, Pedroza testified in detail about the depictions she observed in the videos. Presumably, Pedroza must have viewed the videos multiple times to enable her to recall such details from memory. Her recall established that she had perception of the videos.

¶ 44    Moreover, Pedroza's perception did not need to be based on her observation of the live events because she was not providing an eyewitness account. Instead, her testimony was relevant to the events as depicted in the numerous video recordings. Therefore, to comply with the requirement of Rule 602 regarding a witness's personal knowledge of the events, Pedroza needed to have viewed only the video recordings. The record thereby shows that Pedroza had the personal knowledge required to testify about the events in the videos.

¶ 45    The record further reveals that Pedroza's narrating testimony satisfied the second prong of Rule 701 because the testimony was helpful to the jury as it aided the jury in determining important facts in the case. See *Thompson*, 2016 IL 118667, ¶ 50. It is well established that, as the trier of fact, the jury is responsible for drawing reasonable inferences from the evidence. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Consequently, when the jury is as capable as a lay witness

of drawing inferences and conclusions from observing a video, the lay witness's opinion testimony regarding a video's content invades the province of the jury and is not admissible. *Sykes*, 2012 IL App (4th) 111110, ¶ 36 (citing *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 221 (1985)).

¶ 46 Whether a lay witness's opinion testimony is helpful to a jury is generally based on consideration of the totality of the circumstances. *Thompson*, 2016 IL 118667, ¶ 43. In *Thompson*, the supreme court analyzed how to determine when a lay witness's opinion identification testimony would be helpful to a jury to correctly identify a defendant in a surveillance video or photograph. *Thompson*, 2016 IL 118667. The court discussed several factors that should be considered, including the witness's general level of familiarity with the defendant's appearance and the clarity of the surveillance recording. *Id.* ¶¶ 43-48. The court held that "[l]ay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id.* ¶ 50. The court further stated that testimony admitted under these principles does not invade the province of the jury because the jury is free to disregard or reject the testimony and reach its own conclusions. *Id.* ¶ 54.

¶ 47 Although the issue in this case does not involve identification testimony as Pedroza never identified Johnson as the man in the videos, we find the factors employed by the supreme court in *Thompson* relevant here. Thus, when considering whether Pedroza's testimony was helpful to the jury in determining the facts of the case, we can consider her general level of familiarity with the locations and events depicted in the videos and the clarity of the recordings.

¶ 48    Pedroza was a robbery and burglary detective who worked in the area that included the Wicker Park neighborhood where the offense in this case occurred. She had canvassed the neighborhood surrounding E.T.'s apartment and found the surveillance cameras at three separate residences – two on the same block as E.T.'s building, Bell Avenue, and one on the adjacent block, Oakley. The video recordings were recorded from five separate cameras, specifically, one camera in front of the residence at 1328 North Bell, one camera in front of the residence and one in the back recording the alley at 1352 North Bell, and two cameras in the alley, one facing northbound and one facing southbound, at 1343 North Oakley.

¶ 49    The record shows that during Pedroza's testimony, the State repeatedly switched between videos recorded by the different cameras. Each time a different video clip was played, Pedroza explained which residence and camera recorded that video. For the videos recorded in the alley, she explained whether the view was looking southbound or northbound. The State played numerous video clips, alternating between three DVDs. Pedroza's familiarity with the area and the video recordings and her testimony explaining what was being observed on each clip was not only helpful but necessary for the jury to understand what they were viewing on the numerous videos.

¶ 50    In addition, based on her familiarity with the videos, Pedroza was able to point out specific details that the jurors otherwise may have missed or failed to recognize their significance. Pedroza pointed out when the man in the videos was holding a dark cloth and when he wiped his head and hands with that cloth, one time doing so after urinating on a garage. That testimony aided the jury in connecting the dark cloth to the damp black bandana recovered from E.T.'s bed which contained Johnson's DNA. Pedroza was also able to identify when the man in the videos was walking

northbound and southbound, and at what times, allowing the jurors to determine when the man was heading towards or running from E.T.'s apartment.

¶ 51 The record also shows that at one point during Pedroza's testimony, one of the jurors was having difficulty seeing the video clearly and the screen was moved closer to the jury. The jury observed the video at a distance from the jury box. Consequently, details such as a cloth in the man's hand could have been easily missed without Pedroza's testimony.

¶ 52 Significantly, at no time did Pedroza ever identified Johnson as the man in the videos or testify that the dark cloth in the videos was the same one recovered from E.T.'s bed. The jury was allowed to make those inferences and determine the facts based on the testimony and evidence presented. The jury was free to reject or disregard Pedroza's testimony and reach its own conclusions regarding what and who was depicted in the surveillance videos. Accordingly, Pedroza's testimony did not invade the province of the jury. *Thompson*, 2016 IL 118667, ¶ 54.

¶ 53                                    III. CONCLUSION

¶ 54 For these reasons, we conclude that Pedroza's testimony narrating the surveillance videos was admissible in accordance with Rule 701. The trial court's ruling allowing Pedroza's testimony was not an abuse of discretion. *Brand*, 2021 IL 125945, ¶ 36. We therefore affirm the judgment of the circuit court of Cook County.

¶ 55 Affirmed.