NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210620-U

NO. 4-21-0620

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 5, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| CHARLES F. WATTS, | ) | No. 19CF226 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffery E. Tobin, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State's evidence was sufficient to establish defendant's guilt beyond a
reasonable doubt.

(2) The trial court did not abuse its discretion in sentencing defendant to 18 years
in prison for aggravated battery with a firearm.

¶ 2    Following a bench trial, defendant, Charles F. Watts, was convicted of aggravated

battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)) and sentenced to 18 years in prison.

Defendant appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt and

(2) the trial court abused its discretion with respect to the sentence it imposed. We affirm.

¶ 3                    I. BACKGROUND

¶ 4    In December 2019, the State charged defendant with aggravated battery with a

firearm (*id.*) and aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). The charges were based on

allegations that on December 7, 2019, defendant fired a gun at James Trotter, shooting Trotter in the abdomen.

¶ 5        Prior to trial, defendant moved to suppress evidence that a witness named John Rozycke had identified him as the shooter. The trial court granted the motion, stating as follows:

"The Court has considered the testimony, arguments and case law cited. *** [T]he Court notes that Rozycke had only a brief opportunity to observe the assailant. The name of 'Charles' is suggested multiple times to Rozycke by law enforcement. The Court also notes that Rozycke was consuming alcohol and appeared to be under the influence to some degree. Rozycke indicates that he is not sure if he can pick out the assailant in a photo. Rozycke claimed to be about 70% sure of the identification. The Court has also considered the lineup procedure requirements set forth in [the Code of Criminal Procedure of 1963 (Code of Criminal Procedure)]. Rozycke was told by law enforcement that he did not have a right to leave and he was threatened with arrest if he left the police station prior to providing an identification which constitutes a violation of [the Code of Criminal Procedure]. He was further instructed to 'see if anyone looked familiar' in the photo lineup rather than picking a possible assailant. The photo lineup marked by Rozycke is not clear as to which photo was intended to be marked. The Court finds under the circumstances of this case that the suggestiveness and coercion reduce reliability and create a substantial likelihood of an irreparable misidentification."

¶ 6        The record reflects defendant waived his right to a jury trial, and in April 2021, his bench trial was conducted. Evidence showed that on the evening of December 7, 2019, Trotter was "hanging out" with Melinda Heaser and Rozycke at Heaser's apartment. At some point, Heaser

left the apartment to buy alcohol and a third man arrived at the apartment and shot Trotter. After being shot, Trotter fled the apartment and was located by the police at a nearby bar.

¶ 7 According to Rozycke, the group had been at the apartment for about an hour and were "[d]rinking, and drinking some whiskey on top of it." When they ran out of whiskey, Trotter gave Heaser money to buy more, and she left the apartment to go to a nearby liquor store. Rozycke testified that after Heaser left, another person, whom he described as a black male, showed up at the apartment. The man was not at the apartment "too long" before Rozycke witnessed him pull out a gun. Rozycke testified he heard "a loud bang" that he believed was a gunshot, and then he saw Trotter jump up and exit the apartment. On cross-examination, Rozycke testified that all three individuals at the apartment—Heaser, Trotter, and himself—had been drinking whiskey. However, he denied that there had been any illegal drug use.

¶ 8 Heaser was called by the State to testify and stated she knew defendant, having seen him before and spoken to him on the phone at least once. She was also aware that defendant went by the nickname "L.C." When initially questioned by the State, Heaser asserted she did not really recall what occurred on December 7, 2019, and denied that Trotter was ever shot inside her apartment. On cross-examination, she recalled providing a description to the police on that date of someone running from her apartment. She agreed that she described the person as "tall and skinny." Upon further questioning by the State, Heaser testified that Trotter had been shot in her apartment while she was out. She asserted that prior to the shooting, she was "hanging out" in her apartment with Trotter and Rozycke. According to Heaser, they had been watching television and consuming alcohol. At Trotter's request, Heaser left the apartment to buy more alcohol. Upon her return and when she was "about a half a block away," she heard something that sounded like a gunshot and observed two people leaving her apartment complex and going in different directions.

¶ 9        Trotter testified that on December 7, 2019, he arrived at Heaser's apartment around 6 p.m. after "working [a] poker machine." When he arrived, Rozycke and Heaser were already at the apartment. Trotter asserted the group was "[j]ust hanging out" and that he sent Heaser "to get something to drink" while he counted his money. When asked whether he had been drinking or using drugs at Heaser's apartment, Trotter responded, "No, not yet." He indicated that he had used cocaine there in the past.

¶ 10       Trotter asserted that not long after Heaser left, he answered a knock at the door. Trotter saw a man standing about two feet away and stated he got a clear look at the man's face. He testified he had seen the man two or three times before and recognized him from those previous contacts. Trotter knew the man by the nickname "L.C." Ultimately, he made an in-court identification of defendant as the man that he saw.

¶ 11       According to Trotter, defendant asked how he was doing, and Trotter responded. The two looked at one another as they spoke. Defendant then entered Heaser's apartment "on his own," brushing against Trotter as he entered. Trotter estimated defendant was in Heaser's apartment for 15 to 20 minutes "at the most," but he acknowledged that he was "just guessing" and indicated the time period might have been shorter. While defendant was in the apartment, he and Trotter were in close proximity and Trotter could see defendant clearly. Trotter stated that at some point, defendant pulled out a gun and shot him. He testified that, at that time, he was not paying attention to defendant until he "felt the pain."

¶ 12       Trotter denied that, at the time of the incident, he was under the influence of either alcohol or drugs "to the point where [his] ability to observe and recall *** was impaired." He maintained his memory of the incident and of the face of the shooter was "[v]ery clear." Trotter asserted that he was 100% sure that defendant was the person who shot him.

¶ 13    On cross-examination, Trotter testified that he had not been drinking or using drugs before Heaser left the apartment, stating, "No. I'd just got there." He stated that after defendant entered the apartment but before the shooting, defendant was looking around the apartment. He reiterated that, at the time of the incident, he only knew the person who shot him as "L.C." and not the person's actual first or last name. After the shooting, Trotter told a police officer "at the bar" the nickname that he knew the shooter went by. The police officer then provided the name of the individual who used that nickname. Trotter agreed that was "how [he] knew it was Charles." He also agreed that he was never asked "to do a photo ID *** to pick out the person that shot [him]." Finally, Trotter recalled that he was shot once inside the apartment but shot at twice as he fled.

¶ 14    Jacksonville Police Officer Scott Cleveland testified that at approximately 6:45 p.m. on December 7, 2019, he was dispatched to a bar in response to a call about a man who said he was shot. Evidence showed he found Trotter, who was "leaned back" at the bar with a rag against his chest. Cleveland stated that once the rag was removed, he observed "a small bullet hole [in Trotter's] upper left abdomen area." According to Cleveland, Trotter reported that he was shot by "a young black male" who "was thin" and "wore a black Nike outfit." When Cleveland asked if Trotter knew the shooter's name, Trotter responded that "he just couldn't think of it at the moment." Trotter also asserted that "it was somebody that tried to rob him in the past."

¶ 15    Jacksonville Police Detective Ryan Dudley testified he investigated the shooting and recovered a .22-caliber cartridge casing at the scene. As part of his investigation, he also spoke with Trotter at the hospital and, ultimately, developed defendant as a suspect in the case. Dudley testified he was familiar with defendant, having had prior contacts with him while working as a law enforcement officer. He knew that defendant went by the nickname "L.C."

¶ 16    Dudley stated defendant was arrested and agreed to be interviewed. Defendant

reported that on the day of the shooting, he had been at his apartment for most of the day with an individual named Terrance Linear. Defendant maintained he only briefly left the apartment to walk to a nearby Circle K gas station and then "came right back" to the apartment.

¶ 17 In the course of investigating the information defendant provided, Dudley obtained surveillance videos from outside defendant's apartment complex. On December 10, 2019, Matthew Martin, a "technical advisor" for a business that installed and maintained the surveillance system at defendant's apartment complex, assisted Dudley with retrieving surveillance camera footage from December 7. Martin testified the surveillance cameras were "equipped with time and date stamp *** information," and he asserted that they were working properly at the time he assisted Dudley.

¶ 18 Dudley testified the surveillance system consisted of multiple camera angles. The videos he obtained spanned roughly three and a half hours, from approximately 6:15 p.m. to 9:45 p.m. on December 7, 2019. After reviewing the surveillance videos, he determined they were inconsistent with the information defendant provided during his interview. Specifically, Dudley asserted the videos depicted defendant leaving his apartment at approximately 6:32 p.m. and not returning to his apartment complex until approximately 9:35 p.m.

¶ 19 The surveillance videos were admitted into evidence and portions of the videos were played for the trial court. The videos depicted two black men wearing hooded sweatshirts with their hoods pulled up. The men walked outside the apartment complex and toward a parking lot at approximately 6:30 p.m. They exited a parked vehicle in the parking lot at 9:35 p.m. and walked back toward the apartment complex at 9:36 p.m. Dudley identified the two men depicted in the videos as defendant and Linear. He testified to having had multiple prior contacts with both individuals.

¶ 20    On cross-examination, Dudley acknowledged that his identifications of the individuals in the videos were not based on his observations of either individual's face but, instead, by their mannerisms. In particular, he asserted he recognized defendant by "how he was walking" and his "stature and so forth." Dudley stated he also used his familiarity with defendant and Linear's "physical descriptors," *i.e.*, "height, weight, race, [and] ethnicity," to identify them. Further, he noted the individuals in the video appeared to be coming from the direction of defendant's apartment. Finally, Dudley testified that when defendant appeared on video returning to his apartment complex, "he returned in the same vehicle that [the police] eventually arrested him out of." Dudley acknowledged that he could not view the license plate number of the vehicle on the surveillance video. However, he stated the vehicle "was parked in the same way" and similar in appearance to the vehicle he observed defendant get into "prior to his arrest."

¶ 21    On cross-examination, Dudley also testified that, following the shooting, both Heaser and Rozycke appeared to be under the influence of alcohol. He indicated he did not reach the same conclusion about Trotter, stating: "I don't recall making any observations like that, [Trotter] being under the influence of anything." Dudley recalled that Trotter "mentioned that they'd been drinking at the apartment," but that "[h]e made no mention of using drugs." When Trotter reported to Dudley that "they'd been drinking," Dudley understood Trotter to be talking about himself, Heaser, and Rozycke.

¶ 22    Dudley acknowledged that he did not ask Trotter "to do a photo ID lineup to identify the shooter." Further, he agreed that although the police looked in areas other than Heaser's apartment for cartridge casings—including the front of Heaser's apartment complex, and the parking lot and surrounding area—only one cartridge casing was recovered. Finally, Dudley acknowledged that, during his interview, defendant denied that he shot anyone. Defendant also did

not specify the "specific number" of the times that he left his apartment on the day of the shooting to go to the gas station.

¶ 23 During defendant's case in chief, the parties stipulated that defendant could present evidence showing Trotter "had cocaine in his blood system" when he "was received for treatment" at the hospital. Defendant also presented testimony from Mia Perry. Perry stated she had known defendant for eight or nine years and that the two had been in a "relationship" for two years.

¶ 24 Perry maintained she was with defendant on December 7, 2019. Early in the day, she and defendant shopped for sporting equipment for Perry's daughter. Perry testified they returned to her apartment around noon and "spent the rest of the day pretty much hanging out *** watching movies." According to Perry, she and defendant "pretty much" remained at her apartment, and Linear was also present.

¶ 25 Perry acknowledged that there were occasions when defendant left the apartment. However, she did not remember how many times he left, stating "that was a while ago." Perry also did not recall exactly when during the day defendant left the apartment. She noted her apartment was close to a gas station and a Dollar General store and it was "a normal every day thing" for them to "walk back and forth" to those places. Perry recalled that around 9 or 10 p.m., she and defendant left her apartment together to go to Walgreens. They were also accompanied by Perry's brother, Terrance Jeffries. While they were driving, they were pulled over by the police and defendant was placed in handcuffs.

¶ 26 On cross-examination, Perry testified that she loved defendant and they had been in a romantic relationship since approximately April or May 2019. In December 2019, they were living together, and she had remained in a relationship with defendant since that time.

¶ 27 Ultimately, the trial court found defendant guilty of both charged offenses. In

setting forth its oral ruling, the court stated it found Trotter's testimony was "credible and that he had ample opportunity to observe" defendant.

¶ 28    In July 2021, the trial court conducted defendant's sentencing hearing. Defendant's presentence investigation report (PSI) showed he was 30 years old. His criminal history included a 2009 conviction for passing a bad check, a 2011 conviction for possession of a controlled substance, and a 2015 conviction for the manufacture and delivery of cocaine, for which he was sentenced to five years in the Illinois Department of Corrections (DOC). At the time the underlying offense was committed, defendant was "on parole" and had several pending charges, including a felony charge for unlawful possession of a weapon by a felon, a misdemeanor charge for criminal trespass to a building, and traffic offenses for driving without a license and disregarding a stop sign. Additionally, on at least three occasions, bench warrants had been issued in connection with defendant's failure to appear in court on pending criminal charges.

¶ 29    The PSI also showed that a "LEADS/NCIC Database" inquiry established that defendant had multiple arrests in Missouri between 2009 and 2012 for offenses including assault, forgery, domestic assault, robbery, and possession of a controlled substance. Although the probation officer who prepared defendant's PSI made a request for a comprehensive criminal history for defendant from the St. Louis County probation department, "no further information had been received" with respect to those arrests.

¶ 30    Regarding defendant's personal and family history, his PSI showed he was born in Jacksonville, Illinois, in 1991. His biological father passed away in the early 1990s and, at age 11, defendant moved with his mother to St. Louis. Defendant reported his family was homeless "for the first few years of living in St. Louis" and that his mother and stepfather "used drugs continuously throughout his childhood." In 2013, defendant moved back to Jacksonville at the age

of 22. He stated he had "to grow up faster than most kids to take care of his sister," but he believed his mother "still always tried to do what was best for him and his sister." Defendant maintained that "overall he had a good childhood," and that his childhood struggles "did not influence his present life" because he could " 'block out' and forget about them." Defendant described his current relationship with his mother and stepfather as "good" and noted that they had custody of one of his children.

¶ 31 The PSI further showed that defendant was unmarried but continued to maintain his relationship with Perry. He stated he had five biological children and one stepson, ranging in age from 1 to 13. He did not have custody of any of his children but reported that he had good relationships with his children and that he was "very involved in their lives through sports." The mother of one of his children "passed away due to illness in November 2020," and defendant's mother and stepfather currently had custody of that child.

¶ 32 Regarding defendant's education and employment history, the PSI showed defendant dropped out of school in the eleventh grade because he was working and had "a lot going on." Defendant reported "prior employment at A & W," a job he held after being released from DOC in July 2018 and until the business closed in January 2019. Prior to his arrest in December 2019, defendant worked for Packers Sanitation Service. The business indicated defendant "would be eligible for a re-hire," but "he would be required to go through the interview process again and there [was] no guarantee a position [would] be available."

¶ 33 The PSI showed defendant reported being in good physical health. Although he denied having any current mental health issues, he also stated he was interested in mental health treatment due to struggling "with some trauma and depression from childhood." Defendant further reported abusing alcohol but denied having "a problem with alcohol." He stated he had used drugs

in the past, including ecstasy and cannabis. After his release from DOC, defendant used oxycodone and Percocet for the first time. Defendant asserted he was interested in substance abuse treatment but did "not feel as if his drug use ha[d] affected other parts of his life in a major way." The probation office who authored the PSI questioned defendant's sincerity with respect to his asserted willingness to participate in treatment, noting defendant's statements that he did not believe that his substance abuse had affected his life and a statement that "he would do anything to not return to [DOC]."

¶ 34    Defendant provided a statement, which was attached to his PSI. In the statement, he referenced his children and asserted he was "active" in their lives. He discussed the difficulties his incarceration had on his children and, in particular, the child who resided with his mother and stepfather. Defendant also noted his previous employment, as well as the fact that he had "not had one infraction" while in jail. He maintained that he "had it hard since the age of 11" and asked the trial court for leniency.

¶ 35    Finally, Trotter's victim impact statement was also attached to the PSI. Trotter asserted that since the shooting, he was afraid to go outside at night. He reported that the bullet was "in two of [his] ribs" and that he continued to feel pain in his "side." Trotter maintained he continued to be afraid of defendant and defendant's friends. Further, he stated he had unpaid medical bills as a result of the injury he sustained. Trotter asserted he wanted defendant to "go[ ] to jail for a long time," indicating he wanted defendant to think about what he did to Trotter, who was "a 63[-]year[-]old man."

¶ 36    Neither party presented any additional evidence at sentencing. Emphasizing defendant's "significant criminal history," that his actions caused or contemplated serious bodily harm, and the need for deterrence, the State argued defendant's actions warranted a substantial

prison sentence. It asked the trial court to sentence defendant to 25 years in prison for the more serious of his two offenses, aggravated battery with a firearm. Defendant's counsel recommended a sentence of no more than six years in prison, arguing defendant's criminal history was nonviolent, he was the father of a young child who lost his mother, and that he had "been a model citizen inmate" while in jail.

¶ 37    The trial court found defendant's two offenses merged and sentenced him to 18 years in prison for aggravated battery with a firearm. It stated it had considered the factors in mitigation and in aggravation, the contents of defendant's PSI and its attachments, and the financial impact of defendant's incarceration. Regarding the factors in mitigation, the court found defendant had children whose well-being would be negatively affected by his absence. It found aggravating factors existed, which included that defendant's conduct caused serious bodily harm, his history of prior criminal activity, that the offense was committed against a person 60 years of age or older, and that the offense was committed while defendant was released on parole. The court determined that defendant's imprisonment was necessary to protect the public and "further note[d] the seriousness of the offense."

¶ 38    In August 2021, defendant filed motion to reconsider his sentence, arguing it was excessive. In October 2021, the trial court conducted a hearing and denied the motion.

¶ 39    This appeal followed.

¶ 40                                  II. ANALYSIS

¶ 41                          A. Sufficiency of the Evidence

¶ 42    On appeal, defendant first challenges the sufficiency of the evidence against him. In particular, he argues the State failed to prove him guilty of the charged offenses beyond a reasonable doubt because (1) its case "rested entirely upon a single eyewitness's unreliable

in-court identification" and (2) it failed to disprove his corroborated alibi.

¶ 43        "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. When the defendant challenges the sufficiency of the State's evidence on appeal, the reviewing court must determine "whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Brand*, 2021 IL 125945, ¶ 58, 190 N.E.3d 149. "All reasonable inferences are drawn in favor of a finding of guilt. *People v. Swenson*, 2020 IL 124688, ¶ 35, 181 N.E.3d 116.

¶ 44        Further, the reviewing court's role is not to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. "Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* "Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* Although a finder of fact's credibility determinations are not conclusive or binding on a reviewing court, they are entitled to great deference. *Id.* Ultimately, "[a] criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 45        Here, the trial court found defendant guilty of both aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)) and aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." *Id.* § 12-3 (a). "A person commits aggravated battery when, in committing a battery, he or she knowingly *** [d]ischarges a firearm *** and causes any injury

- 13 -

to another person." *Id.* § 12-3.05(e)(1). Additionally, "[a] person commits aggravated discharge of a firearm when he or she knowingly or intentionally *** [d]ischarges a firearm in the direction of another person." *Id.* § 24-1.2(a)(2).

¶ 46 The evidence showed that on December 7, 2019, Trotter was shot in the abdomen while visiting Heaser's apartment. Defendant does not dispute that someone shot and injured Trotter. Rather, his only contention is that the evidence was insufficient to establish that he was the shooter. Defendant challenges Trotter's eyewitness identification testimony, arguing that the relevant factors for consideration established his identification as unreliable, Dudley improperly suggested defendant's name as the name of the shooter prior to Trotter's in-court identification, and Trotter's overall testimony was improbable. As stated, defendant also contends the State failed to disprove his corroborated alibi, arguing Dudley's identification of him on the surveillance footage was also unreliable. We disagree with defendant's contentions and find the evidence was sufficient to sustain his convictions.

¶ 47 1. *Eyewitness Identification*

¶ 48 "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* "Under this standard, the eyewitness testimony may be found insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.*

¶ 49          Factors to consider when evaluating the reliability of an eyewitness's identification include (1) the witness's opportunity to view the offender at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's descriptions, (4) the witness's level of certainty, and (5) the length of time between the offense and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317, 319 (1989); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). "The conditions need not be perfect and the observation need not be prolonged." (Internal quotation marks omitted.) *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 104, 58 N.E.3d 1242. Other relevant factors for consideration include "whether the witness was acquainted with the suspect before the crime, and whether there was any pressure on the witness to make a certain identification." *People v. Brooks*, 187 Ill. 2d 91, 130, 718 N.E.2d 88, 110 (1999). In determining the reliability of a witness's identification, a court should consider the totality of the circumstances. *Biggers*, 409 U.S. at 188.

¶ 50          The trial court found Trotter's testimony was credible and that he had ample opportunity to observe the shooter. We find no error in the court's determinations.

¶ 51          Initially, contrary to defendant's assertions on appeal, evidence at trial showed that immediately prior to the shooting, Trotter had a sufficient opportunity to view his assailant, and his attention was focused on that individual. Specifically, Trotter's testimony showed he answered a knock at Heaser's apartment door and stood in close proximity to his assailant. The two briefly conversed while looking directly at one another. Trotter stated he had a clear view of the shooter's face and recognized him from prior contacts.

¶ 52          Defendant suggests Trotter's identification testimony was improbable, in part, because he testified that the shooter was in the apartment for 15 to 20 minutes. Defendant asserts that Trotter's testimony was contradicted by Rozycke, who asserted that the shooter was not

present for "too long." Initially, we find Rozycke's testimony on this point was vague, in that he was not asked to specify the precise amount of time that the shooter was in the apartment or what period of time he would have considered to be "too long." Additionally, Trotter himself acknowledged that his estimation of time was a guess, and he indicated that the time period the assailant was in the apartment could have been shorter. Thus, while Trotter may have overestimated how long the shooter was present, his overestimation does not render his testimony unreliable or incredible.

¶ 53     Significantly, the record further reflects that Trotter was previously acquainted with the person who shot him. Trotter testified at trial that he had prior contacts with the shooter and that he knew the man by the name "L.C.," which the evidence established was defendant's nickname. After the shooting, Trotter reported both his familiarity with the shooter and the shooter's nickname to the police. He expressed no doubt about his in-court identification of defendant, asserting he was 100% sure that defendant was the shooter. Further, the record reflects Trotter identified "L.C." as the shooter prior to any suggestion of defendant's name by Dudley. These additional facts weigh strongly in favor of finding that Trotter's identification testimony was reliable. See *Brooks*, 187 Ill. 2d at 130-31 (finding a witness's prior acquaintance with a suspect was "particularly important" and that it rendered other factors, including the length of time between the offense and the identification and suggestive police procedures, "less relevant").

¶ 54     Defendant argues Trotter's credibility and the reliability of his identification are called into question by evidence that he was intoxicated at the time of the shooting. He notes that, at trial, Trotter denied consuming alcohol or using drugs while at Heaser's apartment before the shooting, but that testimony from Rozycke and Heaser indicated that the group had been drinking. Further, he points out that evidence showed Trotter admitted that he consumed alcohol in a prior

statement to Dudley. Defendant also notes that evidence showed Trotter was found to have cocaine in his "blood system" when he received medical treatment after the shooting.

¶ 55 First, neither the mere fact that Trotter consumed alcohol at Heaser's apartment nor, at some point before the shooting, used cocaine is sufficient to establish that he was intoxicated by either substance when the shooting occurred. Both Trotter and Rozycke denied that there was any illegal drug use at Heaser's apartment prior to the shooting. No evidence established when, where, or in what quantities Trotter used the cocaine found in his "blood system," or that such use would have necessarily affected his ability to observe or recall the incident in question. Additionally, although Dudley testified that both Rozycke and Heaser appeared to be under the influence of alcohol after the shooting, his testimony indicated he did not make the same observations about Trotter.

¶ 56 Second, while Trotter's testimony regarding his alcohol consumption was inconsistent with other evidence in the case, we do not find that the discrepancy rendered Trotter entirely incredible. Trotter's testimony was largely consistent with the accounts provided by Rozycke and Heaser and, as discussed above, evidence was lacking that any alcohol or drug consumption by Trotter affected his ability to observe or recall the events at issue. Further, as noted, not only did Trotter have an ample opportunity to observe the shooter, he also recognized the shooter from past contacts and identified defendant as the shooter by his known nickname.

¶ 57 Defendant further contends that Trotter's credibility was "undermined" by his testimony that his assailant fired three shots. He argues Trotter's testimony was impeached by testimony from Rozycke and Heaser, who both stated that they heard one shot, as well as evidence that the police found only one cartridge casing at the scene. Again, we disagree.

¶ 58 At trial, Trotter testified the assailant shot him once while they were inside the

apartment and then shot at him twice more as he fled. Neither Rozycke nor Heaser's testimony was necessarily inconsistent with that version of events. Rozycke, who was inside the apartment, testified he heard "a loud bang" that he believed was a gunshot and saw Trotter jump up and exit the apartment. He was not questioned regarding any of the events that occurred thereafter, including what the assailant did after the first shot or whether he heard any additional gunshots. Additionally, Heaser testified that upon her return from the liquor store and when she was "about a half a block away" from her apartment, she heard something that sounded like a gunshot. When asked if she observed anyone running from her apartment complex "at that time," she testified she observed two people leaving her apartment complex and going in different directions. Given Heaser's location and her immediate observation of individuals leaving her apartment complex, a trier of fact could reasonably have inferred that Heaser testified to hearing a gunshot other than the one fired in her apartment. Finally, that the police recovered only one cartridge casing does not conclusively establish that only one shot was fired.

¶ 59        On appeal, defendant also suggests the trial court's acceptance of Trotter's identification testimony was inconsistent with its pretrial grant of defendant's motion to suppress evidence of Rozycke's identification of the shooter. Defendant asserts Trotter's identification of the shooter was similar to the circumstances of Rozycke's suppressed identification. He notes that when granting that motion, the court found that Rozycke "had only a brief opportunity to observe the assailant" and that he "appeared to be under the influence to some degree." He asserts that the court further relied on "questionable police procedures," including Dudley's repeated suggestions to Rozycke of the name "Charles," *i.e.*, defendant's first name.

¶ 60        Here, the record does not support a finding that Trotter and Rozycke were in the same position regarding either their opportunity to view the assailant or their levels of intoxication.

- 18 -

Unlike Rozycke, Trotter stood in close proximity to the assailant. He had a clear view of the assailant's face as the two briefly conversed. Additionally, although Dudley testified Rozycke appeared to be under the influence of alcohol after the shooting, Dudley indicated he did not make the same observation about Trotter.

¶ 61　　　　Further, in granting the motion to suppress Rozycke's identification of the shooter, the trial court identified multiple ways in which the police procedures that led to Rozycke's identification were improperly suggestive and coercive. The same questionable procedures were not at issue in connection with Trotter's identification of defendant. Additionally, although the record shows the name "Charles" was suggested to Trotter at least once before his in-court identification, it is clear that the suggestion did not occur until after Trotter had already identified the shooter as "L.C.," a person he was acquainted with prior to the shooting.

¶ 62　　　　Trotter positively identified defendant as the person who shot him. We find the totality of the circumstances weighs in favor of finding Trotter's identification was reliable and credible, and that the trial court could reasonably have accepted Trotter's testimony as true beyond a reasonable doubt.

¶ 63　　　　　　　　　　　　　2. *Defendant's Alibi*

¶ 64　　　　As stated, defendant also argues that the evidence was insufficient to establish his guilt beyond a reasonable doubt because the State failed to refute his corroborated alibi. He notes that he reported to the police that at the time of the offense, he was at his apartment with Linear and that he only left his apartment to walk to a nearby gas station. Defendant argues his statements to the police were corroborated by Perry, who testified that she and defendant "pretty much" remained at their apartment on the day of the shooting. Defendant acknowledges Dudley's testimony that surveillance videos depicted him leaving his apartment complex just prior to the

time of the shooting and not returning until several hours later. However, he maintains that Dudley's identification of him on the surveillance footage was unreliable and insufficient to rebut his alibi. We disagree.

¶ 65        The surveillance videos at issue showed two men wearing hooded sweatshirts with their hoods pulled up walking to and from the parking lot outside defendant's apartment complex. Dudley identified the two men depicted in the videos as defendant and Linear. He asserted he had multiple prior contacts with both individuals and identified them by their mannerisms. Dudley asserted he recognized defendant by "how he was walking" and his "stature and so forth." To identify the men, he also used his familiarity with defendant's and Linear's "physical descriptors," *i.e.*, their height, weight, and race. Although the surveillance videos did not clearly or fully show the faces of the men in the video, we find that the depictions of the men were nevertheless sufficient to permit someone who was familiar with them to provide accurate identifications. As stated, Dudley asserted he had multiple prior contacts with both defendant and Linear, creating a reasonable inference that he had the requisite familiarity.

¶ 66        The reliability of Dudley's identifications was also supported by his testimony that the individuals in the video appeared to be coming from the direction of defendant's apartment. Additionally, he testified that the surveillance video showed defendant returning to the apartment complex "in the same vehicle that [the police] eventually arrested him out of," an arrest which the evidence indicates occurred later the same night. Although Dudley acknowledged that he could not view the license plate number of the vehicle on the surveillance video, he indicated that the vehicles were similar in appearance and that the vehicle captured on the surveillance video was parked "in the same way" as the vehicle defendant entered immediately prior to his arrest.

¶ 67        Finally, we note that the trial court was not required to accept Perry's testimony

regarding defendant's whereabouts at the time of the offense without question. Perry acknowledged that she loved defendant and that the two were in a relationship, suggesting she had a motive to testify favorably on his behalf. Further, she acknowledged that defendant left the apartment several times on the day of the offense, and she provided only vague information about those instances.

¶ 68    Under the circumstances presented, we find the trial court could reasonably have accepted both Trotter's and Dudley's identification testimony. The testimony of those witnesses, along with the other evidence presented, was sufficient to establish the necessary elements of both charged offenses beyond a reasonable doubt. Accordingly, we find defendant's challenge to the sufficiency of the evidence has no merit.

¶ 69                                B. Sentencing

¶ 70    On appeal, defendant also argues the trial court abused its discretion by sentencing him to 18 years in prison. He contends his sentence was excessive and the trial court failed to give adequate weight to mitigating evidence, including his (1) youth, (2) difficult childhood, (3) history of employment and supporting his children, (4) lack of a violent criminal history, and (5) history of addiction. Defendant asks this court to reduce his sentence to one that "better reflects his nonviolent history and rehabilitative potential."

¶ 71    The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "This constitutional mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the process requires careful consideration of all factors in aggravation and mitigation." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26, 21 N.E.3d 810.

¶ 72       When imposing a sentence, the trial court has broad discretionary powers, and its ultimate sentencing decision is entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). The court's sentencing determination must be based on the particular circumstances of each case and include consideration of "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). "[A] reviewing court may not modify a defendant's sentence absent an abuse of discretion." *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212.

¶ 73       Here, defendant was sentenced for aggravated battery with a firearm, a Class X felony. 720 ILCS 5/12-3.05(e)(1), (h) (West 2018). For that offense, he faced a sentencing range "of not less than 6 years and not more than 30 years" in prison. 730 ILCS 5/5-4.5-25(a) (West 2018). The trial court sentenced defendant to 18 years in prison, and we find the record fails to reflect an abuse of discretion by the court.

¶ 74       The record shows the trial court properly considered the evidence presented and relied on appropriate sentencing factors. In determining an 18-year sentence was appropriate, the court relied on aggravating factors, including (1) defendant's conduct caused serious bodily harm, (2) defendant's criminal history, (3) the victim was a person over the age of 60, and (4) the offense was committed while defendant was released on bail or parole. The court also noted the seriousness of the offense. On appeal, defendant contends the court overlooked or gave insufficient weight to several mitigating factors that demonstrated his rehabilitative potential. However, none of the evidence that defendant points to on appeal warrants a finding that the sentence imposed by the

court was either greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.

¶ 75        Initially, defendant points to his youth at the time of the offense and his lack of a violent criminal history as evidence warranting a lesser sentence. However, the record shows that at the time of the shooting, defendant, who was born February 1991, was well into adulthood and just over a month shy of turning 29 years old. Additionally, his involvement in the criminal justice system spanned the length of his adult life. In particular, we note the record shows defendant had three prior criminal convictions and that he had previously been sentenced to five years in DOC. At the time of the shooting, defendant was on parole and had pending charges, including one for unlawful possession of a weapon by a felon. Thus, while defendant may have had a history of convictions for only nonviolent offenses, his criminal history was still significant and reflected negatively on his rehabilitative potential.

¶ 76        Defendant also suggests his history of employment and supporting his children demonstrated his capacity for rehabilitation. However, as defendant acknowledges, his history of employment was only recent, and his PSI suggests that he was unemployed for the majority of his adulthood. Additionally, the PSI showed defendant was not a custodial parent of any of his children and it contained little information regarding any support, financial or otherwise, that defendant provided them. We note the trial court did consider as a mitigating factor that defendant had children whose well-being would be negatively affected by his absence. However, that factor was not entitled to any greater weight than the several aggravating factors the court also found were present in the case.

¶ 77        Finally, defendant argues his difficult childhood and history of addiction both weighed in favor of a lesser sentence. Initially, we note that drug addiction is not an explicit

statutory factor in mitigation or aggravation and that "a history of substance abuse is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105, 126 N.E.3d 703. Thus, the court in this case was not required to find that defendant's substance abuse issues necessarily warranted a lesser sentence.

¶ 78        Further, we find defendant's PSI contained conflicting information regarding the impact on defendant of both his childhood experiences and his substance abuse. The PSI showed defendant's childhood included a period of homelessness and substance abuse by his mother and stepfather. However, defendant also reported that "overall he had a good childhood," and that "the struggles of his childhood did not influence his present life." Additionally, while defendant admitted abusing alcohol and drugs and indicated a willingness to participate in treatment, he also denied having a "problem" with alcohol and maintained his drug abuse had not "affected other parts of his life in a major way." Notably, the probation officer who prepared defendant's PSI questioned the sincerity of defendant's assertion that he was willing to participate in treatment given other statements that defendant had made. Under these circumstances, neither factor—defendant's difficult childhood nor his history substance abuse—requires a determination that the trial court should have imposed a lesser sentence.

¶ 79        As stated, the trial court has broad discretionary powers when fashioning an appropriate sentence. In this case, the record does not support a finding that the court abused its discretion.

¶ 80                                III. CONCLUSION

¶ 81        For the reasons stated, we affirm the trial court's judgment.

¶ 82        Affirmed.