2025 IL App (1st) 232332-U

FIRST DISTRICT,
SIXTH DIVISION
July 11, 2025

No. 1-23-2332

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 22 CR 0181901 |
| | ) | |
| TRISTEN MEHALL, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's convictions are affirmed where the circuit court did not rely on evidence outside of the record in finding him guilty, the court did not err in prohibiting cross examination on irrelevant prior conduct, and defendant's out of court hearsay statements were not admissible under the state of mind or excited utterance exceptions.

¶ 2     Following a bench trial on August 20, 2023, the circuit court found defendant Tristen Mehall guilty of one count of aggravated domestic battery by strangulation (720 ILCS 5/12-3.3(a-5) (West 2022)) and one count of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2022))

stemming from an incident with his then-girlfriend, A.W., in the early morning of January 9, 2022. On October 16, 2023, the court sentenced Mehall to serve 60 days in prison and 30 months of felony probation.

On appeal, Mehall contends the circuit court erred by (1) relying on facts not in evidence, (2) limiting cross-examination of a witness, and (3) excluding his statements as hearsay. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                    A. Pretrial

¶ 5          On February 23, 2022, the State charged Mehall with one count of kidnapping, one count of aggravated domestic battery, one count of unlawful restraint, and one count of domestic battery.

¶ 6          On January 18, 2023, Mehall filed a motion to suppress statements he made to police the night of the incident on the basis he was interviewed while handcuffed without being read his *Miranda* warnings. At the evidentiary hearing on Mehall's motion, Chicago Police Officer Gumersindo Juarez testified he responded to a call of a domestic disturbance at the Palmer House hotel with his partner, Officer Camillo, shortly after 1:00 a.m. the morning of January 9, 2022. Juarez encountered Mehall, A.W., and a security guard in the lobby of the hotel. Juarez approached Mehall and asked, "[w]hat exactly is going on, what exactly happened[?]" Mehall stated he was upstairs in a room with A.W. and "they were having sexual intercourse and then he grabbed her by the neck and accidentally scratched her." After A.W. expressed that she wanted to sign complaints against Mehall, Officer Jesus Navarro handcuffed Mehall but did not advise him of his *Miranda* rights. Mehall continued making statements after he was handcuffed. All of this was captured on Juarez's and Navarro's body worn cameras (BWC).

¶ 7          Detective Zachary Negrete reviewed BWC footage, spoke with other officers and A.W., and interviewed Mehall at the police station after informing him of his *Miranda* rights. Mehall

said he and A.W. had been out drinking before returning to their hotel room and engaging in sexual intercourse, during which Mehall put his finger down A.W.'s throat. Mehall said this was "nothing unusual" because they had "rough sex," and he occasionally put his hands around A.W.'s neck during sex. This time, Mehall scratched A.W.'s throat, she bit his hand, and he noticed her throat was bleeding. He worried he had reopened a wound from A.W.'s prior surgery. Mehall gathered their belongings to take A.W. to the hospital and she went to the lobby. While there, A.W. told an employee at the front desk she had been strangled and choked by Mehall and that she wanted to call the police. Mehall "freaked out" and tried to leave the lobby, but a security officer stopped him before he left the hotel.

On June 28, 2023, the circuit court granted Mehall's motion in part, ruling his statements to police while handcuffed were inadmissible, but the remaining statements he made in the lobby and at the police station were admissible. The court found the officers "entirely credible" and that "their accounts were all corroborated by the video footage that I watched." On August 30, 2023, the case proceeded to a bench trial.

¶ 8                                B. Bench Trial

¶ 9        At trial, A.W. testified she was a junior in college in January 2022 and had been dating Mehall for almost a year. The night of January 8, 2022, A.W. and Mehall were visiting Chicago and rented a room at the Palmer House hotel. After dinner and drinks, they had consensual sex.

¶ 10        While lying in bed, A.W. received a "flirty or sexual" direct message from a "random scam person" on Instagram. She responded to the message in a non-serious way to "waste" their time. Mehall saw her messaging, took the phone out of her hand, and grabbed her Apple Watch and car keys. After reading the messages, Mehall deleted them and "got very angry and very loud" and began calling A.W. names. Mehall pushed A.W. away from her phone and held it up so she could not reach it. A.W. told him she did not feel safe being there and wanted to leave. She packed her

things and started to leave, but Mehall stood at the door to block her from exiting. Mehall pushed her back on to the bed every time she reached for the door handle.

¶ 11        A.W. persuaded Mehall to leave the room momentarily so she could "calm down." He stepped into the hallway but left the latch on the door open so he could see inside. A.W. thought about calling 911 on the hotel room phone but was worried Mehall would see her and hurt her. Eventually, Mehall returned to the room and got into bed but still seemed "very angry." He put A.W.'s phone and watch on the table and said he would "hurt" her if she touched them. A.W. managed to take her watch, hide it under her pillow, and later put it on her wrist. At 12:30 a.m., she surreptitiously sent a text message with her watch to a friend, Olivia, asking for help.

¶ 12        The text messages in the record show that at 12:30 a.m. A.W. texted Olivia and said, "Pls help." She gave her friend the hotel room number and said "Call cop." At 12:31 and 12:32 a.m. she restated, "Pls" and "Help me."

¶ 13        Mehall noticed A.W. texting and took her watch and phone again. At 12:44 a.m., he sent text messages to Olivia from A.W.'s phone that say, "i'm good" and "were in bed." Unlike the texts A.W. sent from her watch, these texts use a lowercase letter for the first word, suggesting they came from a different device or were sent by a different author.

¶ 14        A.W. gathered her belongings again and started towards the door, but Mehall blocked her, grabbed her by the neck, and threw her to the ground. He got on top of her and pinned her down with his knees. Mehall pressed his thumb into her throat, blocking her airway and preventing her from breathing, and continued to choke A.W. until her "eyes started rolling to the back of [her] head." A.W. estimated it lasted for five to ten seconds. A.W. tried to scream for help but Mehall forced four of his fingers down her throat. A.W. was scared and in pain. Mehall eventually let up when A.W. started gagging and pulling on his arm.

¶ 15        A.W. told Mehall she needed to go to the hospital because her throat was bleeding. A.W.

recently had her tonsils removed and could feel "sharp pain" in the back of her throat after Mehall removed his fingers. Mehall agreed to take her to the hospital but would not give her items back. They left the room and turned a corner in the hallway, but Mehall returned to the room alone because he forgot his phone. Mehall told her to stay in the hallway, but A.W. ran to the elevator and went down to the lobby alone.

¶ 16 A.W. went to the front desk and used their phone to call 911. She told the dispatcher Mehall "tried to choke" her. A.W. also spoke with a security guard in the lobby who offered help. Mehall reached the lobby and urged A.W. to go to the hospital. A.W. refused because she "didn't feel safe" and was concerned that if she left, she "wouldn't make it back home." A.W. asked the security guard to keep Mehall away from her and get her belongings back. Mehall tried to exit the hotel, but the security guard followed and eventually brought him back to the lobby.

¶ 17 Chicago Police officers arrived and asked A.W. if she wanted to sign a complaint against Mehall. A.W. went to the police station where she observed bruising and other marks to the outside of her neck and bloody fingernail marks in the back of her throat. A.W.'s injuries were photographed, and she gave a statement to police officers.

¶ 18 The State rested following A.W.'s testimony and Mehall made a motion for directed verdict. The circuit court granted a directed verdict on the kidnapping charge but denied it with respect to the other counts.

¶ 19 Mehall's mother, Dr. Janele Noel, testified A.W. and Mehall had been dating for eight to ten months before January 2022, and she paid for their trip to Chicago as a short getaway. Noel was aware that A.W. recently had surgery on her tonsils because her daughter also had the same surgery. Her daughter's surgery resulted in complications causing blood loss and required further medical treatment. Noel received a call from Mehall around 1:02 a.m. on January 9, 2022. She talked to Mehall for approximately two to three minutes, then spoke to A.W. for thirteen or

fourteen minutes. A.W.'s voice was "shaky" as if she had been crying. Noel asked A.W. how she was doing because she wanted to see how much she was bleeding and if she was breathing appropriately.

¶ 20    The circuit court sustained the State's objection to defense counsel's question, "[W]hat did your son tell you in that call?" Defense counsel asserted Noel would testify that Mehall told her on the phone that "he choked [A.W.] and she was bleeding inside and that he wanted to take her to the emergency room immediately because of *** his experience with his sister and [A.W.]'s state." Counsel argued Mehall's statements on the phone were not offered for the truth of the matter asserted but to show his intent and state of mind and could be admitted as an excited utterance. In response, the State argued his statements would only show his state of mind at the time of the phone call, not at the time of the incident. The court agreed, finding the statements did not fall within the then-existing state of mind exception to the hearsay rule. It reserved ruling on whether the statements qualified as excited utterances but ultimately held they did not.

¶ 21    Detective Zachary Negrete testified he and Detective Kevin Ward spoke with A.W. at the police station around 2:00 a.m. on January 9, 2022. During the conversation, A.W. told them Mehall strangled her by putting one or two hands on her neck. Negrete saw bruising on A.W.'s neck during the meeting and photographed her injuries.

¶ 22    Mehall testified in his own defense. He began by saying A.W. accompanied his family on vacation in August 2021, at which time he and A.W. had sex in the shower and A.W. asked him to place his hands around her neck for her pleasure. On the night of January 8, 2022, he and A.W. showered together in the hotel room and then had sex. Mehall put his hands around A.W.'s neck during "foreplay." He also put two fingers into A.W.'s mouth and "accidentally scratched the back of her mouth." While A.W. did not ask him to do this, he said it was "a normal behavior that [they] took part in previously." Mehall said that when A.W. bit his fingers, he withdrew them from her

mouth and "panicked."

¶ 23    A.W. told him she could taste blood in her mouth. Mehall saw the blood and "inferred that we should go to the hospital and go and seek help." Mehall claimed he tried to leave "almost immediate[ly]" but A.W. did not want to go to the hospital because she "didn't have the family funds." Mehall admitted that A.W. asked him to leave the room at one point, but claimed it was because he wanted her to go to the hospital, and she did not want to leave. Mehall denied taking her phone and watch or any of her possessions.

¶ 24    Mehall testified he forgot something as they went down to the lobby, so he returned to the room alone. A.W. went down to the lobby alone and Mehall found her talking with someone there. A security guard then ordered him to return A.W.'s belongings to her. Mehall said he tried to step outside to call his mother, but a security guard followed him because they thought he was fleeing and brought him back into the lobby. Mehall said he called his mother because he was concerned about A.W.'s well-being and trying to convince her to go to the hospital.

¶ 25    On cross-examination Mehall claimed A.W. gave him "nonverbal clues" to put his hands around her neck but admitted she never gave him "verbal clues." Mehall knew A.W. was still recovering from throat surgery and admitted he did not call his mother or 911 from the hotel room when he saw A.W. was bleeding.

¶ 26    Following closing arguments, the circuit court found Mehall guilty of aggravated domestic battery and domestic battery, and not guilty of unlawful restraint. The court found A.W.'s testimony was "very clear, straightforward," "coherent," and "entirely credible." In contrast, the court did "not believe" Mehall and found his testimony "did not ring true." Specifically, the court did not believe his testimony that his conduct in putting his hands around her throat and restricting her breathing occurred only as part of a consensual sexual encounter. The court stated, "It's absolutely uncontradicted that he put his hands around her neck, he strangled her, and he impeded

her breathing. While Mr. Mehall talks about that being a consensual act as part of a sexual encounter, I don't believe that to be the case. And I do not believe Mr. Mehall's testimony."

¶ 27                                   C. Posttrial

¶ 28        Mehall filed a posttrial motion to reconsider or, in the alternative for a new trial, arguing the circuit court erred in excluding Mehall's statements to his mother because they were admissible under Rule 803 to show his state of mind and intent, and as an excited utterance. Mehall also argued the court erred by limiting his testimony about his sexual history with A.W. and that the State did not prove him guilty of aggravated domestic battery and domestic battery.

¶ 29        The circuit court denied Mehall's posttrial motion, finding it did not err by excluding Mehall's statements under the state of mind exception because it was not related to his state of mind at the time of the incident. The court also found Mehall's statement was too temporally removed from an exciting or startling event to meet the hearsay exception. In doing so, the court stated:

> "Regarding the second contention that this Court errored in denying the defendant's statement to his mother under the excited utterance exception.
>
> In this case not only did I have the benefit of hearing from live witnesses, *I had the benefit of seeing video in the body cam from the officers who arrived.*
>
> Not only did I have the testimony of the witnesses, *but [I was] also able to see the demeanor of the people at the moment in realtime* [*sic*].
>
> I don't find that the statements the defendant sought to introduce through his mother met the excited utterance standards since those weren't statements that were made in response to an excited or startling event." (Emphasis added.)

¶ 30        The court also found it properly excluded testimony about previous sexual acts between Mehall and A.W., noting that it had allowed the defense to elicit testimony concerning a prior

instance of A.W. asking Mehall to put his hands around her neck during sex. Finally, the circuit court rejected Mehall's challenge to the sufficiency of the evidence, reiterating, "I found then and I find now that [A.W.] was credible."

¶ 31    Following a sentencing hearing, the court sentenced Mehall to 60 days in custody of the Cook County Department of Corrections and 30 months of felony probation. Mehall appeals.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, Mehall argues the circuit court erred in (1) relying on information not in evidence when it announced it had "had the benefit of seeing video in the body cam" when denying Mehall's posttrial motion, (2) limiting defense counsel's cross-examination of A.W. regarding prior sexual encounters with Mehall, and (3) excluding Mehall's statements during the phone call to his mother as hearsay. We take these in turn.

¶ 34              A. Reference to Evidence Not Presented at Trial

¶ 35    Mehall first argues the circuit court erred when it "relied on body worn camera footage that was not admitted by either party at trial." He points to the court's statements at the posttrial motion hearing where the court refers to looking at the BWC footage and seeing the demeanor of the people in real time.

¶ 36    Mehall takes the court's statements out of context, suggesting that the court considered the unintroduced BWC footage and demeanor of witnesses in connection with its finding of guilt. Not so. The court's reference to the BWC footage is solely in the context of its ruling on Mehall's posttrial motion on the issue of an excited utterance.

¶ 37    Although the BWC footage was not introduced at trial, it is included in the record and was provided to the court pretrial in connection with Mehall's motion to suppress. It was not used as grounds for the court's determination of guilt. Nor is there any indication in the record that the court relied on facts not presented at trial to find Mehall guilty, contrary to the cases Mehall cites.

See *Drovers National Bank v. Great Southwest Fire Insurance Co.*, 55 Ill. App. 3d 953, 957-58 (1977) (trial judge recounted a personal experience in determining whether a building was occupied and specifically stated it was "taking that into account"); *Johnson v. Johnson*, 34 Ill. App. 3d 356, 360 (1975) (judge personally participated in a pretrial agreement concerning the custody and visitation rights and announced it intended to take the boys away from the mother before hearing evidence); *People v. Wallenberg*, 24 Ill. 2d 350, 353-55 (1962) (court found the defendant's testimony not credible based on its personal knowledge of the area where the crime occurred); *People v. Rivers*, 410 Ill. 410, 418-49 (1951) (court based its finding of guilt on its own research into the number of unregistered guns). As such, we find no error.

¶ 38                                    B. Cross-Examination

¶ 39        Mehall also argues the court erred when it prevented him from cross-examining A.W. about "prior sexual history and conduct" between her and Mehall. According to Mehall, this evidence was "paramount to [his] defense that he lacked criminal intent at the time of the actions taken." We disagree. The court's finding boiled down to resolving the credibility of two competing narratives between A.W. and Mehall about whether Mehall's actions occurred as part of a consensual sexual encounter or as a result of a jealous attack. The court did not abuse its discretion in finding their prior sexual history was irrelevant to the question at hand.

¶ 40        A defendant has a federal and state constitutional right to confront witnesses against him, including through cross-examination. U.S. Const., amends. VI, XIV; Ill. Const.1970, art I, § 8; *People v. Klepper*, 234 Ill. 2d 337, 355 (2009). The circuit court has "wide latitude to impose reasonable limitations on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or of little relevance." *People v. Pacheco*, 2023 IL 127535, ¶ 47. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Ill. R. Evid. 401. The court's limitation of cross-examination and rulings on admission of evidence are subject to review under the abuse of discretion standard. *People v. Wilson*, 2012 IL App (1st) 092910, ¶¶ 23-24. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 41    Mehall's defense theory at trial was that his actions underlying the charges of putting his hands around A.W.'s neck and fingers down her throat were consensual sexual acts and he did not have the criminal intent necessary to prove him guilty. For support, defense counsel sought to ask A.W. about several specific prior sexual acts between her and Mehall.

¶ 42    Defense counsel first asked A.W. if she ever engaged in "what's called rough sex" with Mehall. The court sustained the State's objection. Counsel then asked if A.W. previously told Mehall "that bitting [*sic*] [her] ears would turn [her] on." The State objected. At a sidebar, the trial court asked, "I understand your line of questioning regarding this is a consensual event that allegedly occurred during consensual sex. What does her ears have to do with anything?" Counsel responded, "[I]t demonstrates the type of sexual intercourse they had prior to this incident, and it goes to the defendant's state of mind, intent, and motive and really what occurred on that night."

¶ 43    Counsel proffered that in May 2021, A.W. told Mehall that biting her ears would "really turn her on." In July 2021, A.W. told Mehall she wanted him to pull her hair "and F from behind." On November 6, 2021, A.W. asked Mehall to "do it roughly." The court asked defense counsel if there was any other time that Mehall put his fingers down A.W.'s throat as part of consensual sex. After consulting with Mehall, defense counsel replied that in November 2021, A.W. "asked him to put his hands on her throat and do it rough."

¶ 44    The State argued consent was never listed as an affirmative defense and that defense

counsel was attempting to assert it without notice. The circuit court disagreed with the State's characterization, but stated, "I do not want to start going down some rabbit hole about going into sexual escapades between these two individuals that have no bearing with this case." Defense counsel argued she just wanted to ask A.W. "about that one incident" because she believed "it goes to [Mehall's] intent." The State again argued that defense counsel was attempting to raise the affirmative defense of consent without having originally plead the defense, and that cross-examination on prior sexual conduct was irrelevant.

¶ 45   The circuit court stated, "[I]t's not necessarily a consent defense [but] I do not want to start going down some collateral issues and some very sensitive issues, to be frank, about sexual activity between these two so that have nothing to do that are not relevant." When cross-examination resumed, defense counsel was able to ask A.W. whether she asked Mehall to put his hands around her neck during sexual intercourse on vacation in August 2021. However, defense counsel was not allowed to ask about the other incidents.

¶ 46   Using an abuse of discretion standard of review, we cannot say the trial court's ruling is arbitrary, fanciful, unreasonable, or that no reasonable person would take the same view. Of the excluded incidents, only one was somewhat akin to the acts alleged in the charges against Mehall: that in November 2021, A.W. "asked him to put his hands on her throat and do it rough." Counsel did not specifically ask A.W. about this incident but was permitted to ask about a similar incident from August 2021 when A.W. allegedly asked Mehall to put his hands around her neck during sexual intercourse. The other incidents were either dissimilar to acts alleged in the charges (biting ears, pulling hair, and "F from behind") or overly ambiguous ("do it roughly") and of little relevance.

¶ 47   *People v. Fretch*, 2017 IL App (2d) 151107, which Mehall cites, is distinguishable. In *Fretch*, the defendant was convicted of sexual exploitation of a child, public indecency, and

disorderly conduct based on evidence that he knowingly exposed his penis and masturbated in front of a teenage girl. *Id.* ¶ 1. During trial, the State was allowed to introduce evidence of the defendant's prior sexual overtures to minor girls, including the victim, to prove intent and rebut the defendant's statement to police that "it was just a coincidence [that] he was masturbating as [the victim] walked by." *Id.* ¶¶ 9, 48. On appeal, the defendant argued this evidence was improperly admitted because it was "relevant only to show that he had a propensity to target underage girls." *Id.* ¶ 46. The court disagreed, holding it was not an abuse of discretion to allow evidence of other similar acts where intent was an issue at trial. *Id.* ¶ 67.

¶ 48    The facts of *Fretch* are critically different. In *Fretch*, the defendant was seeking to exclude the other-acts evidence, not admit it. Also, the evidence there was more similar to the charged conduct than here, and the defendant made a claim that the victim misinterpreted his actions. In contrast, Mehall's prior acts were not the same as the charged conduct, and Mehall made no claim that A.W. somehow misinterpreted Mehall's actions. Instead, the issue came down to a single fundamental dispute: whether Mehall's actions occurred during consensual sex as he claimed, or outside of a consensual sexual encounter. If it occurred outside of a consensual encounter as A.W. claimed and the court believed, then prior sexual acts involving "rough" play are wholly irrelevant.

¶ 49    Nonetheless, the defense was allowed to ask A.W. about a similar previous interaction on cross-examination. It also introduced evidence of their "rough" sex through Mehall's testimony. As the circuit court stated, it would be inappropriate, unnecessary, and irrelevant to Mehall's defense and supposed lack of intent "to start going down some collateral issues and some very sensitive issues, to be frank, about sexual activity between these two." We agree and hold the court did not abuse its discretion in putting guardrails in place to curb the introduction of the entire sexual history between Mehall and A.W., particularly where all the prior incidents were during consensual sex and none of them involved Mehall placing his fingers down A.W.'s throat to muffle

her screams. Even if the court allowed evidence that the two had previously engaged in consensual "rough sex," this evidence would not change the court's belief in A.W.'s assertion that Mehall's actions in this instance took place entirely outside of consensual sexual intercourse.

¶ 50                                C. Hearsay Statements

¶ 51        Mehall next argues the circuit court erred in excluding his statements to his mother Noel on the phone because they were admissible under the state-of-mind and excited utterance hearsay exceptions. See Ill. R. Evid. 803(3) and (2). Specifically, Mehall sought to introduce the fact he told Noel he had choked A.W., wanted to take her to the emergency room because her throat was bleeding, and he was concerned because of the medical complications suffered by his sister who had undergone the same surgery.

¶ 52        As noted above, "[t]he admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *People v. Brand*, 2021 IL 125945, ¶ 36. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable. *Id*. Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally inadmissible. Ill. Rs. Evid. 801(c), 802; *People v. Tenney*, 205 Ill. 2d 411, 432 (2002). Some hearsay is nevertheless admissible if it falls under a recognized exception, such as the state-of-mind and excited utterance hearsay exceptions listed in Rule 803. See Ill. R. Evid. 803(3) and (2).

¶ 53        First, Mehall argues his statements were admissible under Rule 803(3) as statements of his then existing state of mind. Rule 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule. Ill. R. Evid. 803(3). This exception does not extend to statements of "memory or belief to prove the fact remembered or believed." Ill. R. Evid. 803(3)(A).

¶ 54        In this case, Mehall's statements represent a memory or belief, not his then existing state

of mind. The statements were not made when the incident occurred or immediately afterward. Rather, Mehall placed the phone call to Noel 20 to 30 minutes after the incident ended while he was in the lobby. Mehall admitted that between the time of the incident and phone call to Noel, he took time to pack his and A.W.'s belongings, stepped out into the hall, returned to the room some unspecified amount of time later, finished packing, walked to the elevator, returned to the room again to get a forgotten item, went to the hotel lobby after A.W., and encountered the security guard as he went to leave. Mehall's statements to his mother as to how he was feeling and what he wanted to do after the fact do not manifest his existing state of mind at the time of the incident. Nor do they vitiate his intent.

¶ 55    In *People v. Martinez*, 2025 IL App (2d) 230472-U, the defendant was convicted of attempted first degree murder after a shooting at an apartment residence. *Id.* ¶¶ 2, 4. When police officers first arrived at the apartment, the defendant was ordered to drop the gun but instead began firing at the officers. *Id.* ¶ 4. After he eventually surrendered and was arrested, an officer asked why he was shooting at them. The defendant responded, "I'm sorry. I'm sorry. I panicked. I don't know what the f[***] I'm doing. I'm sorry." *Id.* The trial court's denial of the defendant's motion *in limine* to admit his statement under the state-of-mind hearsay exception was affirmed with the court noting, "defendant's statements in the present case were not indications of his state of mind at the time he fired at the police officers. *** Just because defendant was remorseful does not mean that he did not act with intent." *Id.* ¶ 36. Similarly, Mehall's statement of concern for A.W., expressed to Noel 20 to 30 minutes after the fact, does not mean he did not act with intent at the time he choked A.W. and stuck his fingers down her throat. As such, we affirm the court's exclusion of Mehall's statements as hearsay.

¶ 56    Second, Mehall argues his statements qualify as excited utterances under Rule 803(2) and should have been admitted. Rule 803(2) defines an excited utterance as "a statement relating to a

startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2). For a hearsay statement to be admissible under this exception, the proponent of the evidence must show (1) there was an occurrence that was sufficiently startling to produce a spontaneous and unreflecting statement, (2) there was an absence of time between the occurrence and the statement for the declarant to fabricate the statement, and (3) the statement is related to the circumstances of the occurrence. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005). In applying these elements, a court should consider the totality of the circumstances, including the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest. *Id.*

¶ 57      In denying admission of Mehall's statements, the court specifically found, "The thing is [Rule] 803(2) doesn't give you *carte blanche* just to bring out everything or anything. So objection's sustained at this point. I don't believe you've laid the foundation for an excited utterance." At posttrial, the court further explained that the statements were not "made in response to an excited [*sic*] or startling event" because there was no "relation to the spontaneous or startling event without the absence of time to fabricate." These findings are amply supported by the record.

¶ 58      As the court observed, Mehall failed to establish there was a sufficiently startling event that provoked his statements to his mother. At best, the "startling event" in this case was Mehall's act of putting his hands around A.W.'s throat and fingers down her throat, resulting in bleeding. Mehall's statements were not a product of a sudden spontaneous outburst. They did not occur during or immediately after the event or even while Mehall was in the hotel room. Rather, they occurred 20 to 30 minutes later in the hotel lobby with several intervening steps in between (*e.g.*, packing, leaving the room, returning to the room, going to the lobby, encountering a security guard). While Mehall minimizes the passage of time and the distance travelled, it was well within the trial court's discretion to determine that at this point, Mehall had ample opportunity to reflect

on his actions, regret them, and fabricate statements to his mother. We hold the circuit court did not abuse its discretion in excluding Mehall's statements.

¶ 59                                III. CONCLUSION

¶ 60        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 61        Affirmed.